963 A.2d 253

**NATIONWIDE MUTUAL INSURANCE COMPANY, et al.**

**v.**

**REGENCY FURNITURE, INC.**

**No. 2420, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Jan. 6, 2009.

714

716

Steven E. Leder (Leder Law Group, LLC on the brief) and Jennifer E. Keyser (Timothy F. McCormack, Ballard, Spahr, Andrews & Ingersoll, LLP on the brief), Baltimore, for Appellant.

John R. Solter, Jr. (Jonathan A. Azrael, Azrael, Gann & Franz, LLP on the brief), Baltimore, for Appellee.

Panel: DAVIS, DEBORAH S. EYLER, CHARLES E. MOYLAN, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

Regency Furniture, Inc. ("Regency"), an appellee and cross-appellant, is a furniture store that leased premises from a landlord now known as DDRM Largo Town Center, LLC ("DDRM"), an appellee and cross-appellant.[1] During the relevant time, Nationwide Mutual Insurance Company ("Nationwide"), the appellant and a cross-appellee, issued Regency a Businessowners Policy No. 53 BO 211–358–3005 ("the Policy"), which was in force.

In a single action in the Circuit Court for Prince George's County, Regency sued DDRM for breach of lease, trespass, conversion, and accounting, and DDRM and Nationwide for a declaratory judgment of its (Regency's) rights under the Policy. Regency's claims arose out of three separate events. In the first, on February 4, 2005, DDRM agents allegedly came onto Regency's leased premises and destroyed certain items of its inventory. The second event, in June 2005, was an act of vandalism, by unknown culprits, in which seven HVAC units on the roof of the leased premises were damaged so badly they had to be replaced. The third event occurred over a period of time—from December 2004 to October 2007—during which DDRM insisted that Regency was delinquent in its rent payments.

In the contract and tort claims against DDRM, Regency sought to recover damages for its destroyed inventory. In the contract and declaratory judgment claims, Regency sought reimbursement, either from Nationwide under terms of the Policy, or from DDRM under the terms of the lease, for the expenses Regency incurred in replacing the vandalized HVAC

---

1. The original landlord was Inland Mid–Atlantic Management Corp., which then became the successor-by-merger to Inland Mid–Atlantic Management, LLC. Inland Southeast Largo, LLC and Inland Mid–Atlantic Management Corp. were acquired by DDRM Largo Town Center, LLC. For clarity, we shall refer to those companies as DDRM.

units. In the accounting claim, Regency sought a reconciliation of its rent payments.

The court bifurcated the trial between the counts against DDRM and the one count against Nationwide, but heard arguments of counsel for all the parties together. The case was tried to the court, which rendered a verdict in favor of Regency and against DDRM for conversion, and awarded $34,567.20 in damages. It further rendered a verdict against Nationwide in the declaratory judgment claim, ruling that Regency's expenses incurred in replacing the damaged HVAC units were covered under the Policy. The court did not decide whether DDRM had breached the lease by not paying for the cost of the HVAC unit replacements. The court otherwise ruled that DDRM had not breached the covenant of quiet enjoyment in the lease; that Regency and DDRM had settled the accounting claim; and that Regency had effectively withdrawn its trespass claim.[2]

Nationwide noted an appeal, presenting one question for review, which we have rephrased:

I. Did the trial court err in declaring that the Policy covered the replacement value of the HVAC units?

Thereafter, Regency noted a cross-appeal, posing three questions for review, which we also have reworded slightly:

I. Did the trial court err in ruling that DDRM did not breach the lease?

II. Did the trial court err in ruling that Regency and DDRM fully and finally settled the accounting claim?

III. Did the trial court err in not considering the issue of prevailing party attorneys' fees under the lease?

DDRM noted a cross-appeal, raising one issue, rephrased as follows:

I. Did the trial court err by admitting into evidence certain testimony and documents relating to the value of the inventory items removed from the leased premises?

---

2. There is no challenge to the trespass ruling in this appeal.

Finally, in its brief, Regency moved to dismiss DDRM's cross-appeal as untimely.

For the reasons we shall explain, we shall grant Regency's motion to dismiss DDRM's cross-appeal. We answer "Yes" to Nationwide's question and "No" to Regency's questions. Consequently, we shall affirm the judgment in favor of Regency against DDRM for conversion; vacate the judgment against Nationwide on the declaratory judgment claim; and remand the case to the circuit court for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

On July 15, 2002, Regency entered into a lease ("Lease") with Largo–Springhill LP of a large retail store located in the Largo Town Center in Prince George's County. The store, which used to be a Hechinger's, consists of a 71,042 square foot building and an adjoining fenced-in outdoor storage area, referred to as the "Yard." (Adopting the nomenclature in the Lease, we shall refer to both as the "Demised Premises.") A year later, Regency received notice that the shopping center, including the Demised Premises, was being sold to DDRM. From that time on, DDRM was Regency's landlord under the Lease.

By late 2004, a dispute had arisen between DDRM and Regency over an alleged arrearage in rent (which would constitute a default of the Lease). On February 18, 2005, DDRM sued Regency in the District Court of Maryland in Prince George's County, alleging failure to pay rent due under the Lease. On March 4, 2005, the case was called, but by then the parties had agreed not to appear for trial. In the meantime, DDRM had acknowledged to Regency that there had been errors in its previous invoices, and the parties had agreed to dismiss the rent action and engage in settlement discussions.

Sometime prior to February 2005, Prince George's County ("the County") issued DDRM at least two citations for County

Code violations for failure to properly maintain the Yard.[3] On February 4, 2005, agents of DDRM arrived at the Demised Premises before opening time and began removing items from the Yard. At around 11:30 a.m., Nicholas Fiandaca, a Regency employee, arrived at the Demised Premises and found the sliding gate in the fence to the Yard toppled over, the locks and chains on the gate broken, damage to the concrete slab supporting the fence, and DDRM's agents inside the Yard, with their truck. Fiandaca saw DDRM's agents remove items from the Yard and put them in their truck and into a nearby dumpster. He directed them to stop, and they did.

A few months later, but before June 9, 2005, someone illegally accessed the store roof and vandalized a number of roof-mounted HVAC units. The damage was discovered June 9, 2005, by a maintenance worker with HVAC Mechanical Service, LLC ("HVAC Mechanical"), who was performing a regular service visit. He found that seven of the nine HVAC units had been damaged or had parts stolen. Regency called the police.

The next day, June 10, 2005, Corporal Leonard Hilton, of the Prince George's County Police Department, responded to the call to make a report. He wrote down the information supplied by Regency, including a description of the damage and an estimate of the damaged HVAC units' value. That same day, Regency, through its manager Kenneth Whang, submitted a claim to Nationwide, seeking to recover under the Policy for the damage to the HVAC units. By letter of June 14, 2005, Nationwide denied the claim, stating that the damage was not covered under the Policy because "the damaged property is property of the building owner and not your business personal property," whereas the Policy "is for Business Personal Property that you own that is used in your business." Nationwide suggested that Regency contact DDRM, which it did. DDRM responded, stating that, under

---

3. The citations charged failure to remove trash and debris.

the terms of the Lease, Regency (not it) was responsible for repairing or replacing the damaged HVAC units.

Regency hired HVAC Mechanical to prepare an estimate of the cost to repair or replace the seven damaged HVAC units. HVAC Mechanical determined that the seven units were damaged beyond repair, and that their replacement cost was $135,000.

Meanwhile, Regency informed Nationwide of DDRM's response, provided Nationwide with a copy of the Lease, and asked it to reconsider its claim denial. On January 27, 2006, Nationwide confirmed that the losses were not covered under the Policy and further opined that repair or replacement of the HVAC units was the responsibility of DDRM, as owner and lessor.

Regency contracted with HVAC Mechanical to replace the seven units in accordance with its estimate. The work was completed April 19, 2006. Regency paid HVAC Mechanical two installments of $67,500 each.

On July 11, 2006, in the Circuit Court for Prince George's County, Regency filed suit against DDRM and Nationwide, as noted previously. The case was tried to the court on October 16, 2007. On November 26, 2007, the court issued a written memorandum and order, which was docketed on December 3, 2007.

The court found in favor of Regency against DDRM for conversion and awarded $34,567.20 in damages for the cost of inventory taken from the yard. It found in DDRM's favor on the breach of Lease count and determined that Regency was not entitled to prejudgment interest, that the accounting claim had been settled, and that the trespass claim failed for lack of evidence of damages. It also ruled that neither Regency nor DDRM was a "prevailing party" under a fee-shifting provision in the Lease. Finally, it declared that the replacement cost of the damaged HVAC units was covered by the Policy and ordered Nationwide to reimburse Regency for that cost.

We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

Because the case below was a bench trial, the standard of review is governed by Rule 8–131(c). We shall review the trial court's decision on both the law and the evidence, upholding factual findings unless clearly erroneous, but subjecting its legal conclusions to *de novo* review. *Jackson v. 2109 Brandywine, LLC,* 180 Md.App. 535, 567, 952 A.2d 304 (2008).

Insurance policies are contracts. *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.,* 398 Md. 529, 540, 921 A.2d 245 (2007). The interpretation of a contract is a legal question subject to *de novo* review. *Atl. Contracting & Material Co. v. Ulico Cas. Co.,* 380 Md. 285, 300–01, 844 A.2d 460 (2004); *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250, 768 A.2d 620 (2001). Maryland follows the objective theory of contract interpretation. *Atl. Contracting, supra,* 380 Md. at 301, 844 A.2d 460; *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 166, 829 A.2d 540 (2003). That theory focuses on the written text: the construing court's task is to " 'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.' " *Taylor v. NationsBank, N.A.,* 365 Md. 166, 178–79, 776 A.2d 645 (2001) (quoting *GMAC v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985)).

We begin with the "customary, ordinary, and accepted" meaning of the contractual language, "[u]nless there is an indication that the parties intended to use words in the [contract] in a technical sense." *Lloyd E. Mitchell, Inc. v. Md. Cas. Co.,* 324 Md. 44, 56, 595 A.2d 469 (1991). "The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed." *Wells, supra,* 363 Md. at 251, 768 A.2d 620. "Where the contract comprises two or more documents, the

documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect." *Rourke v. Amchem Prods., Inc.,* 384 Md. 329, 354, 863 A.2d 926 (2004).

 If the contract language in question is clear and unambiguous, "there is no room for construction, and a court must presume that the parties meant what they expressed." *GMAC, supra,* 303 Md. at 261, 492 A.2d 1306. "[T]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." *Atl. Contracting, supra,* 380 Md. at 301, 844 A.2d 460.

 Words in a contract are ambiguous if they reasonably can be understood to have more than one meaning. *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.,* 400 Md. 718, 751, 929 A.2d 932 (2007). Whether the words in a contract are ambiguous is a question of law, which we decide and review *de novo. Id.* "In deciding whether the [language of a] contract is ambiguous, the court may not resort to extrinsic evidence if it will alter the plain meaning of the writing. Instead, the court is confined to a review of the contract language itself; it must consider what a reasonable person in the position of the parties would have thought it to mean." *Univ. of Balt. v. Iz,* 123 Md.App. 135, 162, 716 A.2d 1107 (1998) (citations omitted). If contract language is ambiguous, extrinsic evidence may be considered and "the meaning of the contract is a question to be determined by the trier of fact," subject to review for clear error. *Iz, supra,* 123 Md. App. at 162, 716 A.2d 1107; Md. Rule 8–131(c).

In the case at bar, the Policy was moved into evidence. In pertinent part, it consists of the Businessowners Policy Declarations (3 pages); the Businessowners Policy Supplemental Declarations (1 page); the Businessowners Special Property Coverage Form (24 pages); the Additional Coverage Endorsement (1 page); the Businessowners Liability Coverage Form

(13 pages); and the Businessowners Common Policy Conditions (3 pages).[4]

The Policy Declarations identify Nationwide as the insurer, Regency as the named insured, establish the coverage period as May 3, 2005 to May 3, 2006, and describe the insured premises by number (002) and building number (01) and by address and type of business. The Declarations go on to state:

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE TO PROVIDE YOU WITH THE INSURANCE AS STATED IN THIS POLICY.

PROPERTY COVERAGES
( ) Standard Form (x) Special Form LIMITS OF INSURANCE

| | Premises No. 002 | Building No. 01 |
|---|---|---|
| Limits of Insurance for Buildings | | |
| Replacement Cost (RC)/Actual Cash Value (ACV) | ( ) RC | ( ) ACV |
| Automatic Increase | ( ) % | |
| Business Personal Property | $1,300,000 | |

Deductible *$ 250* This Policy includes Business Income and Extra Expense Coverage Optional Coverage/Exterior Building Glass Deductible $ 500

The Declarations then list Optional Property Coverages, some of which are checked and followed by Limits of Insurance amounts (but none of which are relevant here), Coverage Extensions (none selected), Additional Coverages (none selected), and Liability and Medical Expense Coverages, for which Limits of Insurance are stated.

The Businessowners Special Property Coverage Form provides, in relevant part:

A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

1. Covered Property

Covered Property, as used in this policy, means the type of property as described in this section, A.1, and limited

---

4. The Policy also includes a number of provisions and exclusions that are not relevant to the issues in this case.

in A.2, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a.** Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery; and

(b) Equipment;

(4) Your personal property in apartments or rooms furnished by you as landlord;

(5) Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(6) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the buildings or structures;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

**b.** Business Personal Property located in or on the buildings at the described premises . . . including:

(1) Property you own that is used in your business;

(2) Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition E.6.d.(3)(b);

(3) Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove; and

(4) Leased personal property for which you have a contractual responsibility to insure unless otherwise provided for under Paragraph A.1 b.(2).

 In its memorandum opinion, the circuit court described the declaratory judgment question before it as "the status of the [HVAC] units under the [L]ease and whether repair or replacement of the units is the responsibility of Nationwide as Regency's insurer, or [DDRM] as landlord." Focusing first on subsection A. 1.b of the Policy, the court decided that the HVAC units were "fixtures," because they were "immovable and permanent once affixed, and [did] not maintain ... portability," and they satisfied the definition of a fixture in BLACK'S LAW DICTIONARY.[5] The court reasoned that, as fixtures, the HVAC units were real property and thus could not fall under the definition of "Business Personal Property"; therefore, "Nationwide properly declined coverage under section A. 1.b of the Policy."

The court then turned its attention to subsection A. 1.a(2) of the Policy and ruled that, because the units were "fixtures," they were "covered property under [A.1.a(2) ] and Nationwide improperly denied coverage. Accordingly, Nationwide is liable to Regency for the replacement value of the HVAC units."

Nationwide contends the trial court misread the Policy language to mean that Regency had purchased "Buildings" coverage, which would include the replacement cost of the damaged HVAC units, when, in fact, Regency only had purchased "Business Personal Property" coverage. Nationwide further argues that, on the facts adduced at trial, the court correctly found that the HVAC units were fixtures and there-

---

5. A fixture is "personal property that is attached to land or a building and that is regarded as an irremovable part of the real property." BLACK'S LAW DICTIONARY (8th ed.2004).

fore were not "Business Personal Property" that would be covered under the Policy.

■ The operative language for our purposes is in Policy Section A.1 "Covered Property." As quoted above, that subsection defines "Covered Property" as "the type of property as described in this section, A.1, and limited in A.2, Property Not Covered, *if a Limit of Insurance is shown in the Declarations for that type of property.*" (Emphasis added.) The Declarations pages of the Policy show "Limits of Insurance" only for "Business Personal Property" and not for "Buildings." In short, Regency did not buy "Buildings" coverage.

It is apparent from his Memorandum Opinion that, in deciding the coverage question, the trial judge looked to the definition of "Covered Property" in the Policy without reference to the Declarations. The trial judge wrote:

However, the preceding section of the Policy, § A.1.a (1)-(3), specifically provides for the type of property covered under the Policy. Covered property in the policy means:

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this policy, means the type of property as described in this section, A.1, and limited in A.2, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a.** Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed additions;

(2) *Fixtures,* including outdoor fixtures;

(3) Permanently installed:

(a) Machinery; and

(b) Equipment;

See Nationwide Insurance Policy A. 1.a at p. 205 (emphasis added). As set forth above, HVAC units are fixtures. Therefore, the HVAC units are covered property under the enumerated terms in § A. 1.a. and Nationwide improperly denied coverage. Accordingly, Nationwide is liable to Regency for the replacement value of the HVAC units.

By interpreting the term "Covered Property" without reference to the Limits of Insurance in the Declarations, the court erred. Because the Declarations do not contain Limits of Insurance for "Buildings" coverage, no such coverage was purchased by Regency, and therefore it has no such coverage.

Recognizing the trial court's error, Regency does not ask this Court to affirm the declaratory judgment finding of coverage on the ground relied upon by the trial court. Instead, it argues that the HVAC units are "Business Personal Property," under subsection A.1.b.(2), because they are the "[p]roperty of others [DDRM] that is in your [Regency's] care, custody or control." [6] It reasons as follows:

The HVAC units were "property of others," as they belonged to DDRM, not to Regency; and they were in Regency's "care, custody or control," because the Lease required Regency to maintain them. Therefore, even if the HVAC units were "fixtures," as the court found, and "fixtures" ordinarily are real property, the units fall under subsection (b)(2) of the "Business Personal Property" coverage. Regency cites two Nebraska cases to support the "care, custody or control" part of its argument. It further argues that the HVAC units are not excluded from being Business Personal Property merely because they are real property. Given that the "Buildings" coverage in subsection A. 1.a lists some items that are personal property, and the "Business Personal Property" coverage in subsection A. 1.b. lists some items that are "fixtures,"

---

**6.** An exception for "Loss Payment Property Loss Condition E.6.9.(3)(b)" does not apply as it concerns the *value of* the insured property, not whether the property is covered at all.

and thus a species of real property, the two categories of coverage are not mutually exclusive.[7]

Nationwide counters that the opening sentence of the "Building Personal Property" coverage section requires covered items of property to be "Business Personal Property located in or on the buildings at the described premises," and that the sections that follow merely are examples that are included. Although some of the examples could be classified as species of real property, they are covered because they are listed specifically. Otherwise, for an item to be covered under section A. 1.b., it must be personal property, and the HVAC units are not. Nationwide maintains that the trial court correctly found that the units were fixtures that are expressly covered under section A. 1.a. of the Policy (the coverage Regency did not purchase); and viewing the language of the Policy as a whole, it would make no sense for the same item of property, here the HVAC units, to be covered under both the "Buildings" coverage *and* the "Business Personal Property" coverage.

The issue here is whether the Policy language affording coverage for "Business Personal Property located in or on the building[s]". . . including "[p]roperty of others that is in [the insured's] care, custody or control" is clear, *i.e.*, not ambiguous, and, if so, whether it covers the HVAC units. We conclude that the Policy language in question, as quoted above, is clear and does not cover the HVAC units. An item of "personal property" is a "thing," whether movable or intangible, "that is subject to ownership and not classified as real property." BLACK'S, 8th ed. Thus, the plain meaning of the introductory language of Section A. 1.b., "Business Personal Property located in or on the buildings at the described

---

7. For example, the "Buildings" coverage includes "Your personal property in apartments or rooms furnished by you as landlord" and "Personal property owned by you that is used to maintain or service the buildings or structures or the premises . . ."; and the "Business Personal Property" coverage includes tenants' "improvements and betterments," which are "fixtures, alterations, installations or additions" as further specified.

premises," is any *thing* on or in the building. The plain meaning of subsection (2) of the list of included items in that section—"Property of others that is in [the insured's] care, custody, or control"—is a thing other than real property that belongs to someone other than the insured but is being kept in or on the building by the insured. The trial judge in the case at bar found, and we agree, that HVAC units are fixtures, which means that, although they may have started out as "things," they have become attached to and part of real property, and therefore are real property. Because the HVAC units are not things, as opposed to real property, they cannot be covered items under subsection (2) of Section A. 1.b., regardless of who owns them, who has care, custody or control over them, or what care, custody or control means.

We see no merit in Regency's argument that, because some items of real estate are included in the subsections that are examples of "Business Personal Property," it is not a requirement, generally, that, for an item to be "Business Personal Property," it must not be real property. To be sure, some specifically identified items that might be categorized as real property are listed, expressly, as being included in the "Business Personal Property" section. Because they are specifically identified, however, their inclusion does not modify, generally, the meaning of "personal property" as used in the introductory sentence in section A. 1.b. so as to qualify any item of real property as an item of personal property, for purposes of coverage. Indeed, if that were the case, there would be virtually no distinction between the "Buildings" and "Business Personal Property" coverages, which would be illogical, because the coverages are separately purchased and therefore are meant to be different.

 Regency advances an alternative argument that, even if the Policy language does not cover the replacement cost of the damaged HVAC units, Nationwide is estopped to deny coverage because of representations made in its letter of January 27, 2006. In that letter, an agent from Nationwide's Claims Department stated that "[i]tem A.1.b.(4) [of the Policy]

would provide coverage if the lease agreement states the tenant has a duty to insure." This argument also is without merit.

As already noted, soon after the damage to the HVAC units was discovered, Regency notified Nationwide, which responded by letter of June 14, 2005, that the Policy did not cover the loss. The letter explained that, under the Policy language, the HVAC units were not "Business Personal Property" because they were part of the building and hence property of the landlord. When DDRM refused to reimburse it for replacing the damaged units, Regency asked Nationwide to reconsider its earlier denial. In response, Nationwide advised that it would do so, but that it required a copy of the Lease between Regency and DDRM. After reviewing the claim in light of the Lease, Nationwide once again denied coverage, this time in the letter of January 27, 2006.

The language at issue in the January 27, 2006 letter centers on two subsections of the Policy: A.1.b(2) and A.1.b(4). As discussed *supra*, subsection A.1.b(2) governs business personal property "of others that is in [the insured's] care, custody or control," whereas subsection A.1.b(4) governs "[l]eased personal property for which [the insured has] a contractual responsibility to insure, unless otherwise provided for under [ ] A.1.b(2)." Nationwide ruled out coverage under A.1.b(2) because "[b]uilding property . . . on the roof of the building is not in our insured's care, custody, and control and does not qualify for coverage." As to A.1.b(4), Nationwide observed, this "would provide coverage if the lease agreement states the tenant has a duty to insure it." Nationwide went on to say that "[t]he lease agreement does not require the tenant to insure the building except for negligence of the tenant," and therefore, "the loss and damage . . . is not covered" by the Policy.

Now Regency maintains that it relied, to its detriment, on the statements in the January 27, 2006 letter and that Nationwide should be estopped to deny coverage. We disagree.

Detriment and reliance are elements of estoppel.[8] *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 310, 936 A.2d 343 (2007) ("Equitable estoppel essentially consists of three elements: 'voluntary conduct or representation, reliance, and detriment.' ") (quoting *Mona Elec. Co. v. Shelton,* 377 Md. 320, 334, 833 A.2d 527 (2003)); *Creveling v. GEICO,* 376 Md. 72, 101–02, 828 A.2d 229 (2003) (explaining that "[t]he basis of equitable estoppel is the effect of the conduct of one party on the position of the other party" and thus a party may be absolutely precluded from exercising a legal right when its conduct has induced detrimental reliance by another). The party asserting estoppel "bears the burden of proving the facts that create it." *Creveling, supra,* 376 Md. at 102, 828 A.2d 229.

Regency's argument ignores the controlling fact that Nationwide denied coverage in its original letter and in the disputed letter. An insured making a claim cannot reasonably rely to its detriment on the insurer's *denial of coverage* for an expectation that the insurer will, in fact, pay the claim as covered. The record contains no evidence whatsoever that Regency changed its position in reliance on Nationwide's statement. When Nationwide refused coverage, Regency was free to challenge that decision in court and to pursue its remedies against DDRM. Regency did exactly that. As Regency failed to adduce any evidence of detrimental reliance, its alternative argument in support of the trial court's Policy coverage ruling must fail.

## II.

We shall discuss Regency's three issues together, as they are interrelated.

---

8. Regency does not specify whether its claim rests on equitable estoppel or promissory estoppel, but instead asserts simply that "Nationwide [s]hould [b]e [e]stopped" to retract its statement in the January 27, 2006 letter. We interpret Regency's claim as equitable in nature, but note in passing that promissory estoppel (itself an equitable doctrine) likewise is based on detrimental reliance. *Citiroof Corp. v. Tech Contracting Co.,* 159 Md.App. 578, 589 & n. 8, 860 A.2d 425 (2004).

Regency's breach of Lease claim was based, in part, upon an allegation that DDRM had violated section 13.01 of the Lease, an express covenant of quiet enjoyment.[9] That section states: "Tenant shall peaceably and quietly hold and enjoy the Demised Premises for the Lease Term without hindrance or interruption by the Landlord, subject, nevertheless, to the terms and conditions of this Lease." *See also* Md.Code (1974, 2003 Repl.Vol.), section 2–115 of the Real Property Article (providing that there is an implied covenant of quiet enjoyment in a lease, unless the lease provides otherwise). Regency argued below (and repeats on appeal), that DDRM's conduct in pursuing, without justification, excess rent, and in having its agents enter the Yard on February 4, 2005, and remove property, amounted to a breach of the covenant of quiet enjoyment.

The trial court ruled against Regency on this claim. It explained that the dispute respecting overcharging of rent had been settled, by resolution of the accounting claim and dismissal of the District Court rent action, and therefore did not constitute a breach of the Lease; and, with respect to the covenant of quiet enjoyment argument, "Regency failed to provide any evidence that the Yard was unusable or that [DDRM] interfered with Regency's business activity." The court further concluded that its ruling against Regency on the breach of Lease claim obviated the need to decide whether Regency would be entitled to "prevailing party" attorneys' fees under a fee-shifting provision of the Lease.[10]

---

**9.** As we have discussed, Regency also sued DDRM on the Lease on the claim that, as between the two of them, DDRM was responsible for replacing the damaged HVAC units, and therefore owed to Regency the sum it had expended to do so. The court did not address this claim because it found that Nationwide's Policy covered the replacement costs for the HVAC units.

**10.** Again, because the trial court decided as it did against Nationwide on the coverage issue, it did not decide whether DDRM had any liability under the Lease for the cost of replacing the HVAC units and further did not decide whether, if DDRM did, Regency would be entitled to prevailing party attorneys' fees under the Lease.

Regency contends the trial court's ruling on the breach of Lease claim is inconsistent with certain of its factual findings, and therefore cannot stand. In particular, Regency cites the court's findings that an accounting revealed that DDRM had consistently overcharged Regency by about $2,900 per month; that DDRM continued to make accounting errors throughout the tenancy; and that, on February 4, 2005, DDRM's agents broke into the Yard and removed and disposed of Regency's property, thus converting it. Regency asserts that these findings compelled the conclusion that DDRM breached the Lease.

We first shall address the court's ruling on Regency's allegation of a breach of the covenant of quiet enjoyment. In Maryland, generally, in the absence of an actual or constructive eviction, a tenant will have a claim for damages caused by conduct by the landlord that strikes at the essence of its obligations under the lease. *Legg v. Castruccio*, 100 Md.App. 748, 778–82, 642 A.2d 906 (1994)(discussing *Stevan v. Brown*, 54 Md.App. 235, 247–48, 458 A.2d 466 (1983), in turn discussing *Charles E. Burt, Inc. v. Seven Grand Corp.*, 340 Mass. 124, 163 N.E.2d 4 (1959)). Thus, there may be a breach of the covenant of quiet enjoyment even when the tenant remains in possession of the premises. *Legg, supra*, 100 Md.App. at 781, 642 A.2d 906. The scope or magnitude of the interference necessary to constitute a breach of the covenant of quiet enjoyment must be such as goes to the essence of what the landlord is to provide. *Id.* at 779, 642 A.2d 906. If that is proven, a breach of the covenant of quiet enjoyment will be established and the tenant may recover damages incurred by the breach, *i.e.*, the difference in value between what the tenant in fact received and what he would have received, absent the breach. *Id.* at 781, 642 A.2d 906.

In the case at bar, the central factual finding by the court on the breach of covenant of quiet enjoyment claim was that Regency had not proven, by a preponderance of the evidence, that DDRM's actions on February 4, 2005, substantially interfered with Regency's use of the Demised Premises,

thus damaging Regency. This factual finding was not clearly erroneous. DDRM's agents went to the Yard before Regency's opening time on the day in question, entered by removing a gate, and started removing items from the Yard. When an employee of Regency appeared, also before opening time, he directed DDRM's agents to stop what they were doing and leave, and they did so. The court determined that, although this conduct by DDRM's agents effected a conversion of Regency's personal property, it did not substantially interfere with Regency's use of the Demised Premises. In other words, there was no evidence that because of the actions of DDRM's agents on February 4, 2005, Regency was deprived, actually or constructively, of the use of the Demised Premises, so that there was a difference in value between the Demised Premises as actually received under the Lease and as should have been received.

The record evidence supports the trial court's finding on this point. To be sure, the court found, as Regency points out, that on February 4, 2005, DDRM's agents broke down the gate around the Yard, entered it, and removed and disposed of Regency's property, thus converting it. That finding alone did not compel the conclusion that DDRM had breached the covenant of quiet enjoyment.[11] Again, for such a breach to be found, there must be evidence that the landlord substantially interfered with the tenant's *use* of the premises, to the tenant's injury. The trial court did not err in concluding that the proof offered by Regency did not satisfy such a showing, even though it did satisfy a showing of conversion of personal property.

 Regency's other operative breach of lease argument is that the court was compelled to conclude that DDRM had

---

11. As mentioned previously, Prince George's County had issued violation notices regarding maintenance of the Yard. We note that Section 4.03(a) of the Lease permitted DDRM, "at its sole option," to "arrange for the removal and disposition of Tenant's trash from the Shopping Center," and that Section 1.01 of the Lease provided that, "[s]ubject to County approval, Tenant may use the outside storage area for sales and storage, but said outside storage area shall not be enclosed."

breached the Lease once it found that DDRM consistently overcharged Regency by about $2,900 per month and continued to make accounting errors throughout the tenancy. The evidence established that an accounting of the overcharges had been made and agreed upon; that DDRM had tendered payment to Regency for the amount of the overcharges; and that the District Court litigation between DDRM and Regency over the issue of rent due or overpaid was dropped. Regency maintains that, even though these disputes were resolved, the parties had not come to an agreement about prevailing party attorneys' fees, under Section 11.03 of the Lease; and therefore, there nevertheless was a breach of the Lease, and the trial court erred in its treatment of the attorneys' fees issue.[12]

Section 11.03 of the Lease provides for fee shifting to the "non-defaulting party" if that party "shall prevail in litigation." The trial court ruled that, because the accounting claim was resolved between the parties and the rent litigation was dismissed, Regency was not a "prevailing party" in litigation against a defaulting party.

In the cases Regency cites, in which a trial court erred in not enforcing a contractual fee-shifting clause, a judgment was entered in favor of the prevailing party for breach of contract. *See Hensley v. Eckerhart,* 461 U.S. 424, 426–29, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (plaintiff obtained a judgment on one of three counts); *Myers v. Kayhoe,* 391 Md. 188, 192–93, 207–08, 892 A.2d 520 (2006) (abuse of discretion where trial court granted summary judgment but refused to enforce contractual fee shifting provision); *Stratakos v. Parcells,* 172 Md.App. 464, 468, 477–78, 915 A.2d 1022 (2007) (affirming the award of attorneys' fees upon grant of summary judgment). *See also Farrar v. Hobby,* 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("The plaintiff must obtain an enforceable

---

12. The court recognized that in their settlement of the accounting/rent dispute, the parties had not resolved whether Regency was entitled to prejudgment interest on the sum of rent that it had been overcharged, and therefore had overpaid. The court addressed the prejudgment interest issue and decided it against Regency. Regency does not contest that decision on appeal.

judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement.") (citations omitted).

In the present case, Regency prevailed on its conversion claim but settled the accounting/rent dispute, except for the issue of prevailing party fees. Applying the teaching of *Stratakos, supra*, the conversion count did not "arise out of" the Lease, and Regency did not "prevail" on the accounting/rent dispute. *Stratakos* is distinguishable because there the sellers successfully defended allegations that they had made false or negligent misrepresentations involving the same contract containing the fee shifting provision. 172 Md.App. at 466, 915 A.2d 1022. By contrast, in this case, the conversion of Regency's personal property stood apart from the Lease, and thus is not covered by the shifting clause, and the parties' pretrial resolution of the accounting/rent dispute meant that the trial court was not being asked to enter a judgment, which would have designated a "prevailing party." Although a consent order may, under some circumstances, support an award of attorneys' fees to a "prevailing party," *Maher v. Gagne,* 448 U.S. 122, 129–30, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), here there was no consent order entered by the court. There merely was a private resolution of the accounting/rent dispute. The trial court was correct to rule that the parties' private resolution of the accounting/rent claim was not a determination of that issue by litigation, and therefore did not trigger the fee-shifting clause. So, even though the parties had carved out from their settlement the issue of prevailing party attorneys' fees under Section 11.03 of the Lease, they indeed settled privately the dispute over an accounting and rent, with the result that Section 11.03 was not, and could not have been, triggered.

## III.

The circuit court issued its memorandum opinion and order on November 26, 2007. The order was docketed December 3, 2007. Under Rule 8–202(a),[13] the deadline for filing a notice of

---

**13.** Md. Rule 8–202 states in relevant part:

appeal was 30 days later, *i.e.*, January 2, 2008. Nationwide filed its (timely) notice of appeal on December 18, 2007. Under subsection 8–202(e), the deadline for any other party to note an appeal was January 2, 2008, because that date was later than 10 days after Nationwide had filed its notice of appeal. Regency filed a notice of appeal on December 27, 2007. DDRM filed a notice of appeal on January 4, 2008.

In this court, Regency has filed a motion to dismiss DDRM's cross-appeal as untimely. In response, DDRM argues that its appeal was timely under Rule 8–202(e), or in the alternative, that we should exercise our discretion under *Maxwell v. Ingerman*, 107 Md.App. 677, 670 A.2d 959 (1996), to consider its belated cross-appeal.

 In construing a Maryland Rule, we apply the same rules of interpretation as we do in construing statutes. *King v. State*, 400 Md. 419, 429, 929 A.2d 169 (2007). We must ascertain and effectuate "the purpose and objectives of the rule," beginning with its plain language. *Johnson v. State*, 360 Md. 250, 264, 757 A.2d 796 (2000). If the language of the rule is unambiguous, our analysis ordinarily is complete. *Ishola v. State*, 404 Md. 155, 160, 945 A.2d 1273 (2008). If the text of the rule admits of more than one reasonable meaning, however, we will turn to secondary indicia of meaning such as "legislative history" (such as Rules Committee meeting minutes and Court of Appeals hearing transcripts), case law, and

---

**(a) Generally.** Except as otherwise provided in this Rule or by law, the notice of appeal shall be filed within 30 days after entry of the judgment or order from which the appeal is taken. In this Rule, "judgment" includes a verdict or decision of a circuit court to which issues have been sent from an Orphans' Court.

\* \* \*

**(e) Appeals by Other Party—Within Ten Days.** If one party files a timely notice of appeal, any other party may file a notice of appeal within ten days after the date on which the first notice of appeal was filed or within any longer time otherwise allowed by this Rule. **(f) Date of Entry.** "Entry" as used in this Rule occurs on the day when the clerk of the lower court first makes a record in writing of the judgment, notice, or order on the file jacket, on a docket within the file, or in a docket book, according to the practice of that court, and records the actual date of the entry.

purpose. *Opert v. Criminal Injuries Comp. Bd.*, 403 Md. 587, 593, 943 A.2d 1229 (2008). We take special care to avoid strained or absurd interpretations. *In re: Colby H.*, 362 Md. 702, 722, 766 A.2d 639 (2001). We do not add or delete language "so as to reflect an intent not evidenced in the plain and unambiguous language of the [rule]," nor do we "construe the [rule] with forced or subtle interpretations that limit or extend its application." *Price v. State*, 378 Md. 378, 387, 835 A.2d 1221 (2003).

■■ DDRM first argues that its cross-appeal was timely under Rule 8–202(e) because it was filed January 4, 2008, within ten days of *Regency's* filing its notice of appeal on December 27, 2008. We disagree. Rule 8–202(e) plainly states that, "[i]f one party files a timely notice of appeal, any other party may file a notice of appeal *within ten days after the date on which the first notice of appeal was filed* or within any longer time otherwise allowed by this Rule." (Emphasis added.) This language is unambiguous, and, as applied here, means that, once Nationwide filed its notice of appeal, which was the *first* one filed, *all* other parties were required to file notices of appeal, if any, within ten days, unless the Rule otherwise permitted a longer time. Indeed, the Rule did otherwise permit a longer time, as ten days after December 18 would have been December 28, but 30 days after December 3 was January 2. Thus, the deadline for DDRM to file a notice of cross-appeal, under Rule 8–202(e), was January 2, 2008.[14] The January 4, 2008 filing was two days late.

DDRM maintains that, because the case was bifurcated, there was no reason for it to file an appeal in reaction to Nationwide's filing one. In other words, its reason to file a notice of appeal was not "triggered" until Regency filed its

---

14. Regency actually argues, incorrectly, that DDRM's cross-appeal was filed seven days late, not two days late. Regency mistakenly counts the date the trial court's opinion was issued—November 26, 2007—as the date of "entry" under Rule 8–202(f) and argues, therefore, that the last day for DDRM to note an appeal was December 28, 2007. November 26, 2007, was the date the opinion was issued, not the date on which it was entered, which was December 3, 2007.

notice of appeal. This argument ignores the plain language of the Rule. Simply because the trial court bifurcated the proceedings did not mean there were two separate cases. At all times, DDRM remained a party to a single case and its status was not altered by the trial court's exercise of its discretion to set the order of presentation. As a party, DDRM was required to follow the deadline for filing a notice of appeal as set by subsection 8–202(e).

■ Anticipating that possible result, DDRM next asks, alternatively, that we consider its tardy appeal because, under the circumstances, there was "exceedingly good cause" for its untimeliness, hence the exception set forth in *Maxwell, supra,* 107 Md.App. 677, 670 A.2d 959, should apply.

■ In *Maxwell,* this Court examined cases in the federal courts of appeal that construed an analogous provision in the Federal Rules of Appellate Procedure ("FRAP"), FRAP 4(a)(3).[15] We adopted the reasoning of those courts that have held that a belated cross-appeal is not jurisdictionally defective.[16] The theory underlying these decisions is that appellate jurisdiction is conferred by the original filing of a timely notice

---

**15.** In relevant part, FRAP 4 states as follows:
**(a) Appeal in a Civil Case.**
**(1) Time for Filing a Notice of Appeal.**
 **(A)** In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after the judgment or order appealed from is entered.

* * *

**(3) Multiple Appeals.** If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

**16.** By contrast, failure to file a notice of appeal within the 30–day deadline of Rule 8–202(a) is a jurisdictional defect. *See Houghton v. County Comm'rs of Kent County,* 305 Md. 407, 413, 504 A.2d 1145 (1986) ("The requirement of Rule 1012 and its predecessors, that an order of appeal be filed within thirty days of a final judgment, is jurisdictional; if the requirement is not met, the appellate court acquires no jurisdiction and the appeal must be dismissed."). (Present Rule 8–202 was derived from former Rule 1012. Both Rules contain the same 30–day time limit for the appeal from a final judgment.)

of appeal by one party, so the appellate court has jurisdiction over a second notice of appeal, by another party, even if it is not timely filed. The court nevertheless has discretion to entertain the late-filed second appeal, or not. We held that "if good cause—exceedingly good cause—is shown for the untimeliness, we may, in our discretion, excuse the untimeliness and consider issues raised in the cross-appeal." *Maxwell, supra,* 107 Md.App. at 681, 670 A.2d 959.

In *Maxwell,* the plaintiff filed a timely notice of appeal under Rule 8–202(a), including a certificate of service as required by Rule 1–323. Through inadvertence, she did not mail the certificate of service and notice until eleven days after filing the notice of appeal. Because the 30–day filing period had expired before the 10–day filing period, and the 10–day filing period had elapsed, it was impossible for the defendant to file a timely cross-appeal. We elected to exercise our discretion to decide the defendant's late-filed cross-appeal.

The instant case is distinguishable from *Maxwell.* Here, DDRM received a timely notice that Nationwide had filed a notice of appeal. Even though Nationwide's appeal did not directly implicate DDRM's interests, nevertheless, DDRM had reason to think that Regency would file its own appeal, an event which could implicate DDRM's interests. It should have been clear to DDRM that if Nationwide were to prevail on appeal, DDRM likely would become the target of Regency's claim for reimbursement for the replacement costs of the vandalized HVAC units. There is not "exceedingly good cause" here to warrant exercising our discretion to excuse DDRM's untimely filing of its cross-appeal. Accordingly, we shall grant Regency's motion to dismiss under Rule 8–602(a)(3).

## CONCLUSION

In summary, we shall reverse the judgment of the trial court as to Nationwide's liability under the Policy; affirm as to Regency's issues on cross-appeal; and dismiss DDRM's cross-appeal. We shall remand the case to the circuit court for

further proceedings to decide whether DDRM is liable to Regency under the Lease for the replacement costs of the vandalized HVAC units. If Regency prevails on that issue, it may attempt to enforce Section 11.03 of the Lease, limited to its fees and costs in pursuing that claim, which is its remaining, and now relevant, claim of breach of the Lease.

**APPEAL BY DDRM DISMISSED. OTHERWISE, JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED IN PART AND AFFIRMED IN PART. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED BETWEEN REGENCY AND DDRM.**