(April 12, 2011)

■ RESIDENTIAL HOLDINGS III LLC, Respondents-Appellants, v ARCHSTONE-SMITH OPERATING TRUST et al., Appellants-Respondents. (And a Third-Party Action.) [920 NYS2d 349]—

Order, Supreme Court, New York County (Richard B. Lowe, III, J.), entered April 15, 2009, which denied defendants' and plaintiffs' motions for summary judgment, unanimously modified, on the law, to the extent of granting defendants' motion for summary judgment dismissing the complaint as well as summary judgment on defendants' counterclaims, and declare that defendants are not in breach of the agreements, and otherwise affirmed, with costs. The Clerk is directed to enter judgment accordingly.

In late March 2007, plaintiffs, as purchasers, and defendants, as sellers, entered into 11 distinct but related agreements for the sale of multifamily properties for a total purchase price of more than $1.2 billion. Although the relevant contractual

language can be read more narrowly, the parties agree that each agreement provides that a default under it constitutes a default under each of the other agreements. The planned closings on these properties were staggered into groupings. The sales of seven of the properties closed in early August 2007. The closing date for the final four properties, twice extended upon plaintiffs' request, was scheduled for January 10, 2008. This dispute between the parties centers on "Governor's Green," one of these four properties, a 478-unit property that was to be sold for $105 million.

By letter dated January 9, 2008, plaintiffs asserted that defendants had defaulted in connection with Governor's Green and informed defendants that they "hereby elect[ed] to terminate" all remaining agreements between the parties and made a demand for the immediate release of the contract deposits held by the parties' escrow agent, the third-party defendant. The reason given was a tenant solicitation campaign by defendants at Governor's Green. Specifically, on January 2, 2008, defendants placed "door hangers," essentially advertisements, on the front doors of all of the apartments in the complex. These door hangers offered tenants both a free month's rent upon the signing of a lease before January 8, 2008 at a nearby residential complex owned by defendants that was not among those to be purchased by plaintiffs, and $100 off their final rent payment at Governor's Green. The door hangers were part of a larger campaign to increase the occupancy rate at the nearby property through advertisements and other marketing efforts directed at the public.

Plaintiffs claimed that the door-hanger solicitation violated a number of provisions of the Governor's Green agreement. The specific contentions plaintiffs made need not be detailed. Suffice it to say that whether defendants were free to solicit tenants at the properties they were selling (either before or after closing) is not addressed by any provision of the agreement. We note, too, that the agreement requires defendants to provide rent rolls, and certify their accuracy, at the time it is executed and at closing. The agreement, however, does not require defendants to maintain occupancy rates at any particular level.

Defendants responded that same day with a letter denying that any default had occurred, asserting that the purported termination notice was of no force or effect (because, inter alia, plaintiffs had not provided the requisite notice and opportunity to cure) and informing plaintiffs that defendants were ready, willing and able to close. With respect to notice and opportunity to cure, section 8.3 provides: "Notwithstanding anything to the

contrary set forth in this Agreement, no party shall be deemed in default hereof unless that party has received notice of such default from the other party and has failed to cure such default within five (5) days following such party's receipt of such notice. In the event the default cannot be cured within five (5) days, the defaulting party will be deemed to have cured the default if it begins curative action within five (5) days, diligently pursues to cure the default, and the default is in fact cured prior to Closing. In the event any such notice is received less than five (5) days prior to Closing, Closing shall be extended to that date which is five (5) days following the date of such party's receipt of the notice."

Apparently, plaintiffs did not respond. The agreement provided for the closing to occur by 5:00 P.M. on January 10 and defendants appeared for the closing. Plaintiffs were not present at that time but defendants tendered performance, a process that concluded at 4:30 P.M. Shortly before 5:00 P.M., plaintiffs appeared, but defendants had left. Counsel for plaintiffs stated plaintiffs' position that the contracts properly were terminated.

Plaintiffs commenced this action in 2008, seeking a declaration that defendants were in default under each of the four remaining agreements for soliciting tenants at Governor's Green (and at another complex)* and that plaintiffs were entitled to the immediate return of the contract deposits. Plaintiffs also asserted they were entitled to the same relief under another cause of action, entitled "Breach of Contract - Implied Covenant of Good Faith and Fair Dealing." Plaintiffs also sought legal fees pursuant to section 10.10 of the agreement, which grants "all reasonable costs, charges, and expenses, including attorneys' fees" incurred by the prevailing party in an action to enforce any of the provisions of the agreement.

In their answer, defendants denied the material allegations of the complaint and asserted counterclaims, inter alia, for breach of contract. Defendants then moved for summary judgment, seeking dismissal of the complaint and requesting declaratory relief in the form of a declaration that they were not in breach of the agreements. Defendants also requested an award of legal fees, as well as the release of the funds in escrow, which the agreement specifies are to be delivered to the seller as liquidated damages in the event of default by the purchaser.

---

* The other complex was among the properties that closed in August 2007. Although plaintiffs alleged in their complaint that the solicitation of tenants at that property constituted defaults under the Governor's Green agreement and each of the remaining three agreements, they do not press that claim on appeal.

Plaintiffs cross-moved for summary judgment on their claims and for dismissal of defendants' counterclaims.

The undisputed facts include the following: the occupancy rate at Governor's Green was 93.7% when the agreement was executed and 97.5% in January 2008 when the door hangers were hung. As of January 9, 2008, 1 of the 478 residents of Governor's Green took advantage of the offer made by the door hangers, which expired by its terms the day before, January 8. The tenant who moved had paid a monthly rent of $1,480 and the lease was scheduled to terminate on June 22, 2008.

Defendants argue that the use of the door hangers did not violate the Governor's Green agreement; that even if a breach occurred, it was immaterial; and that plaintiffs breached that agreement by declaring, without providing any opportunity to cure, that they were terminating the agreement as well as the remaining three agreements. Because we agree that defendants' other arguments are correct, we need not determine whether the use of the door hangers violated the agreement.

As the parties specified in their agreements, their rights are governed by Maryland law. Under Maryland law, only a contractual breach that is material is grounds for rescission (see *Traylor v Grafton,* 273 Md 649, 687, 332 A2d 651, 674 [1975]; *Rogers Refrig. Co., Inc. v Pulliam's Garage, Inc.,* 66 Md App 675, 684, 505 A2d 878, 883 [1986]). A breach is material only if it "affects the purpose of the contract in an important or vital way" (*Gresham v Lumbermen's Mut. Cas. Co.,* 404 F3d 253, 260 [2005] [internal quotation marks and citation omitted]), as when "the act failed to be performed [goes] to the root of the contract or . . . render[s] the performance of the rest of the contract a thing different in substance from that which was contracted for" (*Traylor,* 273 Md at 687, 332 A2d at 674; *see also Speed v Bailey,* 153 Md 655, 660, 139 A 534, 536-537 [1927]). Moreover, contracts should not be interpreted so as to produce absurd results (*Middlebrook Tech, LLC v Moore,* 157 Md App 40, 849 A2d 63 [2004]).

Under the agreements, as interpreted by the parties, a default under one agreement constitutes a default under each of the other agreements. Particularly given the absence of any require-ment that defendants maintain occupancy rates at any particu-lar level, it would be absurd to conclude that a default potentially undoing a $1.2 billion real estate deal would occur if one or a handful of tenants at one of the properties determined on his, her or their own to move prior to the closing of that property. Not surprisingly, plaintiffs do not contend otherwise. Rather, plaintiffs stress the intentional character of the door-

hanger solicitation. But the crux of this $1.2 billion deal is surely its economics and they are the same if a tenant moves to the adjoining property on his or her own initiative or is solicited to do so by defendants. For this reason, we fail to see why the intentional character of the door-hanger solicitation should be so critical to plaintiffs' claim of breach. Accordingly, no material default occurred when defendants intentionally caused one tenant to move from Governor's Green to the nearby property. Similarly, the materiality of this alleged default does not turn on whether it is correctly characterized by plaintiffs as "conscience-shocking," "brazen" or "wanton." The immateriality of the alleged default is all the more evident given the undisputed increase in occupancy rates between the execution of the agreement and the scheduled closing on January 10. Plaintiffs correctly argue that, windfall or not, they are entitled to the benefit of that increase. However, especially when viewed against the backdrop of that increase, the loss of a single tenant in a 478-unit property cannot reasonably be seen as material.

Defendants also are correct that plaintiffs improperly terminated the agreements. The notice and cure provision of the Governor's Green agreement is unambiguous (*see Nationwide Mut. Ins. Co. v Regency Furniture, Inc.*, 183 Md App 710, 723, 963 A2d 253, 260 [2009] [under Maryland law, whether the words in a contract are ambiguous is a question of law to be decided by the court and reviewed de novo]). " 'In deciding whether the [language of a] contract is ambiguous, the court may not resort to extrinsic evidence if it will alter the plain meaning of the writing. Instead, the court is confined to a review of the contract language itself; it must consider what a reasonable person in the position of the parties would have thought it to mean' " (*id.*, quoting *University of Baltimore v Iz*, 123 Md App 135, 162, 716 A2d 1107, 1121 [1998], *cert denied* 351 Md 663, 719 A2d 1262 [1998]). The language of section 8.3 ("no party shall be deemed in default hereof unless that party has received notice of such default from the other party and has failed to cure such default") makes notice and an opportunity to cure conditions precedent to a default. As a matter of law, no default could have occurred when plaintiffs purported to declare the agreement terminated. Having improperly terminated the agreements, plaintiffs are "in a position analogous to one who has unjustifiably rescinded a contract. Such a party cannot prevail on a breach of contract action" (*Hubler Rentals, Inc. v Roadway Express, Inc.*, 637 F2d 257, 260 [1981] [construing Maryland law]).

We are unpersuaded by plaintiffs' argument that defendants

waived their cure rights by taking the position in their responsive letter of January 9, 2008 that they had not committed any default. Plaintiffs do not cite any authority in support of this argument and we reject its premise, i.e., that defendants should have insisted on the cure rights provided by the Governor's Green agreement even though plaintiffs were insisting that all of the agreements had been terminated.

Nor are plaintiffs persuasive in arguing they were not required "to close and hope for the best" because "they had no way of knowing how many tenants would *ultimately* relocate and what the eventual financial damage would be." Plaintiffs cite no authority in support of this argument, the implicit premise of which is that they were entitled simply to assume the financial damage from the door-hanger solicitation would be nontrivial, unascertainable and thus incurable. Plaintiffs' acknowledged lack of knowledge about the number, if any, of tenants who might relocate actually cuts against, not in favor, of their position that they were free to declare the agreements terminated. This argument also ignores both that the door-hanger solicitation expired by its terms two days before the scheduled closing and that, as the new owners of Governor's Green, plaintiffs could refuse to release from his or her lease any tenant who sought to accept the solicitation despite its expiration. Provided they acted in accordance with their contractual duty to act in good faith (*Food Fair Stores, Inc. v Blumberg*, 234 Md 521, 200 A2d 166 [1964]), the sophisticated, well-counseled parties to these transactions certainly could have found ways to hold plaintiffs harmless against the possibility that the door-hanger solicitation might result in a nontrivial number of tenants moving to the nearby property. Instead, effectively foreclosing any possibility of such a negotiated resolution, plaintiffs precipitously declared all the agreements terminated.

Finally, Maryland law does not recognize an independent cause of action for breach of the duty of good faith and fair dealing (*see G.M. Pusey and Assoc., Inc. v Britt/Paulk Ins. Agency, Inc.*, 2008 WL 2003747, *7, 2008 US Dist LEXIS 37525, *20-21 [D Md 2008]). Plaintiffs argue that they intended to assert in their second cause of action, not an independent cause of action for breach of the covenant of good faith and fair dealing, but only a cause of action for breach of contract that included a breach of the covenant of good faith and fair dealing. Assuming that to be the case, the second cause of action is subject to dismissal nonetheless, because it is duplicative of the first cause of action seeking both a declaration that defendants breached the

agreements and the same damages, i.e., return of the deposit funds held in escrow (*see Bell BCI Co. v HRGM Corp.*, 276 F Supp 2d 462, 463 n 1 [D Md 2003]).

For these reasons, we affirm the motion court's denial of plaintiffs' motion for summary judgment on their claims and for dismissal of defendants' counterclaims, and reverse so much of the motion court's order as denied defendants' motion for summary judgment. We grant that motion, dismiss the complaint, declare defendants were not in breach of the agreements and order the third-party defendant to deliver the escrow funds in the amount of $13,271,454 to defendants as liquidated damages. As defendants are the prevailing party in this action, plaintiffs must pay legal fees in accordance with section 10.10 of the agreement.

We have considered plaintiffs' remaining arguments, including the contention that under the agreements the materiality of a breach of an obligation, as opposed to a warranty or representation, is not relevant, and find them unavailing. Concur—Gonzalez, P.J., Saxe, McGuire, Manzanet-Daniels and Román, JJ.