985 A.2d 51

**Dorianne THOMAS, M.D., et al.**

v.

**CAPITAL MEDICAL MANAGEMENT ASSOCIATES, LLC.**

No. 545, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Dec. 7, 2009.

440

442

444

Julie Glass Martin–Korb of Rockville, and Philip B. Zipin of silver Spring, for appellant.

Catherine H. McQueen and Robert S. Selzer, of Bethesda, for appellee.

Panel: WOODWARD, ZARNOCH and WRIGHT, JJ.

WRIGHT, J.

Appellee, Capital Medical Management Associates, LLC ("CMMA"), provides billing services for medical practices. On March 15, 2005, CMMA entered into a Billing Services Agreement ("Agreement") with "Capitol Radiology, DBA Laurel Radiology" ("Laurel Radiology"). Dr. Dorianne Thomas, the principal for Capitol Radiology, LLC, signed the Agreement on the signature line for Laurel Radiology. On May 19, 2006, CMMA discontinued providing billing services, alleging breach of contract.

On July 25, 2006, CMMA filed a one-count complaint for breach of contract, in the Circuit Court for Montgomery County, against "Dorianne Thomas, MD d/b/a Capitol Radiolo-

gy and/or Laurel Radiology, and Capitol Radiology, LLC" (collectively, "appellants"). On November 1, 2006, appellants filed an answer and counterclaim, alleging breach of contract, negligent misrepresentation, and constructive fraud. A three-day bench trial was held on March 10–12, 2008. On March 19, 2008, CMMA filed a petition for attorney's fees, citing an indemnification provision in the Agreement. On April 14, 2008, the trial court issued an oral opinion, ruling in favor of CMMA and awarding contract damages in the amount of $55,396.83, attorney's fees in the amount of $119,909.80, and costs in the amount of $4,442.53. Appellants timely appealed.

## Questions Presented

Appellants present four questions, which we have reordered and revised for clarity: [1]

1) Did the trial court err in finding that appellants were parties to the Agreement?

2) Did the trial court err in finding that, under the Agreement, appellants had a duty to provide demographics and to perform credentialing?

3) Did the trial court err in awarding appellee contract damages for work that CMMA had not yet performed?

4) Did the trial court err in awarding appellee attorney's fees pursuant to the Agreement's indemnification clause?

---

**1.** In their brief, appellants asked:

1) Did the trial court err in awarding the plaintiff attorney's fees for prosecuting a first-party breach of contract claim and for defending against a counterclaim where the contract provided for payment of attorney's fees only as part of indemnification against a third-party suit?

2) Did the trial court err in ruling that the defendants Dorianne Thomas, MD and Capitol Radiology, LLC waived their defense of failure to state a claim on the grounds that there was no contract between the parties to the lawsuit?

3) Did the trial court err in construing the contract to require that defendants Dorianne Thomas, MD and Capitol Radiology, LLC perform duties that the contract did not require them to perform?

4) Did the trial court err in awarding the plaintiff contract damages that were speculative and were not provided for in the contract?

We answer the first three questions in the negative, and the last question in the affirmative. As such, we affirm the circuit court's judgment in part and reverse in part.

### Facts

In January 2005, Dr. Dorianne Thomas started her own radiology practice and formed Capitol Radiology, LLC, a limited liability company organized under Maryland law.[2] The practice consists of two components: 1) providing radiology services at Laurel Regional Hospital, beginning in February 2005; and 2) providing radiology services at a private office in Laurel, Maryland, beginning in March 2005. Needing assistance in the "start-up process" for her practice, Dr. Thomas hired Snyder, Cohn, Collyer, Hamilton & Associates, P.C. ("Snyder Cohn"), a full-service firm providing management advisory services to businesses. Snyder Cohn directed Dr. Thomas "to look at [CMMA] as a billing company," and therefore, Dr. Thomas scheduled an initial meeting with CMMA.

On March 15, 2005, CMMA entered into the Agreement with "Capitol Radiology, DBA Laurel Radiology." Dr. Thomas signed the Agreement on the line below the name Laurel Radiology, while Jeanne Kohn, the General Manager of CMMA, signed on the line above the name CMMA. Nowhere in the Agreement did it indicate the letters "LLC" after the words "Capitol Radiology" or that Capitol Radiology was a limited liability company.

The Agreement stated, in pertinent part:

2. *Duties and Responsibilities of CMMA.*

(a) Based upon the demographic and charge [in]formation provided by Capitol Radiology, DBA Laurel Radiology, CMMA shall be responsible for the timely preparation of billing statements and insurance forms.... CMMA will

---

2. A "limited liability company" is "a permitted form of unincorporated business organization which is organized and existing" under Maryland Code (1975, 2007 Repl.Vol.), § 4A–101 *et seq.* of the Corporations & Associations Article.

review and post charges within 72 hours of receipt from the client.

(b) CMMA shall in a timely manner forward or distribute all billing statements and insurance forms to the appropriate agency, carrier or patient within 72 hours of receipt of charge information.

(c) CMMA shall bill on behalf of and under the name of Capitol Radiology, DBA Laurel Radiology, and will assume responsibility for the collection of all accounts receivable.... CMMA will post all payments within 48 hours of receipt.... CMMA shall not commingle Capitol Radiology, DBA Laurel Radiology's funds with its own funds....

(d) CMMA shall post all payments and adjustments to the patient account records and shall provide monthly reports....

(e) CMMA shall provide training and support services to the office personnel of Capitol Radiology, DBA Laurel Radiology to assist them in the proper assembly of information for CMMA.

(f) If this billing Agreement is terminated, CMMA will at Capitol Radiology, DBA Laurel Radiology's option, complete all billing activities for services rendered up to and including the termination date. This will include the resolution of Accounts Receivable balances and collections as needed to complete outstanding work up to 90 days past termination date provided that CMMA is paid for its services in a timely manner and at the prevailing rate.

(g) If the relationship between CMMA and Capitol Radiology, DBA Laurel Radiology is terminated, CMMA agrees to cooperate in transferring billing records to the new billing entity, if any.

3. *Duties and Responsibilities of Capitol Radiology, DBA Laurel Radiology.*

Capitol Radiology, DBA Laurel Radiology shall provide to CMMA on a daily or other mutually agreeable basis all of the demographic and charge information necessary to prepare the billing statements and insurance forms that

CMMA is required to prepare under this Agreement and shall permit employees of CMMA to interface with the office personnel of Capitol Radiology, DBA Laurel Radiology to enable the CMMA employees to obtain this information.

* * *

7. *Compensation*

Capitol Radiology, DBA Laurel Radiology shall pay to CMMA as compensation for the billing services rendered under this Agreement an amount equal to 8.5% of net collections of hospital charges and 7.5% of office charges. CMMA shall bill Capitol Radiology, DBA Laurel Radiology by written invoice on a monthly basis, which invoice shall be payable upon presentation. . . .

* * *

9. *Termination and Breach*

(a) *General Breach* In the event that either party should be in default in the performance of any material provision of this Agreement, (non-payment of CMMA's invoice shall be considered a material provision), and such default is not cured within twenty (20) days after receipt of written notice of such default from the other party, the non-defaulting party, at its option, may terminate this Agreement by delivering written notice to such defaulting party within five (5) days after the expiration of said twenty (20) day period.

(b) In the event of termination or in the event of discontinuance of CMMA's business, all records in CMMA's possession which are the property of Capitol Radiology, DBA Laurel Radiology shall be returned to Capitol Radiology, DBA Laurel Radiology within 30 days of said termination.

10. *Indemnification*

(a) Capitol Radiology, DBA Laurel Radiology shall indemnify and hold CMMA harmless from and against all claims, demands, costs, expenses, liabilities and losses (including reasonable attorneys' fees) which may result against CMMA

as a consequence of: (i) Capitol Radiology, DBA Laurel Radiology, performance of this Agreement, except to the extent caused by the acts or omissions of CMMA; or (ii) which arise out of any alleged medical malpractice, malfeasance or neglect caused by Capitol Radiology, DBA Laurel Radiology, its employees, agents or independent contractors, in connection with the rendering of, or failure to render, any medical or other service to any person.

(b) *CMMA* CMMA shall indemnify and hold Capitol Radiology, DBA Laurel Radiology harmless....

\* \* \*

14. *Miscellaneous*

\* \* \*

(e) *Entire Agreement* This Agreement contains the entire understanding among the parties hereto and with respect to the subject matter hereof, supercedes all prior and contemporaneous agreements and understanding, inducements or conditions, express or implied, oral or written, except as herein contained. This Agreement may not be modified or amended other than by an agreement in writing.

CMMA immediately began providing medical billing services for appellants, the business entity created by Dr. Thomas, following the provisions in the Agreement. In May 2006, CMMA terminated the Agreement, alleging that appellants "fail[ed] to provide CMMA with timely information, fail[ed] to compensate CMMA and fail[ed] to take such necessary steps to ensure that the bills processed by CMMA would be paid by the respective insurance company and/or governmental agency."

### Procedural History

On July 25, 2006, CMMA filed a one-count complaint for breach of contract against appellants, "Dorianne Thomas, MD d/b/a Capitol Radiology and/or Laurel Radiology, and Capitol Radiology, LLC." On November 1, 2006, appellants filed an

answer as well as a counterclaim, alleging breach of contract, negligent misrepresentation, and constructive fraud. On December 7, 2006, CMMA filed a motion to dismiss Count II (negligent misrepresentation) of appellants' counterclaim. The court denied that motion on September 25, 2007. Thereafter, on December 5, 2007, CMMA filed an amended answer to the counterclaim.

On January 25, 2008, CMMA filed a motion for summary judgment on all counts. On February 14, 2008, appellants filed a motion for preliminary determination of question of law regarding interpretation of contract, pursuant to Maryland Rule 2–502. Specifically, appellants asked the court to "declare that the Agreement did not require Dr. Thomas to input and format the demographic information," that "the Agreement is ambiguous as written on this point," and that "an award of attorney's fees is not available on a claim of breach of the Agreement." The court denied appellants' motion as moot.

On March 10, 2008, the court heard arguments on CMMA's motion for summary judgment, while appellants orally moved for summary judgment. The court denied both parties' motions and proceeded with a three-day bench trial. At the end of trial, CMMA made an oral motion, pursuant to Maryland Rule 1–341, for award of its attorney's fees incurred in defending against appellants' counterclaim. The court denied that motion and took the case under advisement.

On March 19, 2008, CMMA filed a motion for attorney's fees, per the Agreement, which appellants opposed. On April 14, 2008, the court issued an oral opinion, ruling in favor of CMMA. Specifically, the court found:

1) appellants "waived their ability to challenge being sued by filing an answer, filing a counterclaim, and failing to timely raise the issue;"

2) appellants breached the contract by failing "to pay CMMA for April, May, and June of 2006," failing "to provide the demographics to CMMA," and failing "to fulfill the credentialing requirement;"

3) appellants did not "prove[ ] a breach of contract by a preponderance of the evidence in the counterclaim," "didn't prove its count of negligent misrepresentation by a preponderance of the evidence," and "failed to prove, by a preponderance of the evidence, that the plaintiff . . . defrauded them."

Subsequently, the court awarded CMMA contract damages in the amount of $55,396.83, broken down as follows:

$45,234.17: monies past due for the months of April, May, and June 2006

$5,690.33: amount that CMMA was unable to bill because of appellants' "failure to obtain all of the credentialing they needed," calculated by taking 8% of the value of appellants' 28.5% collection rate over the previous four months (i.e. appellants retain 28.5% of bills collected from services and, under the Agreement, CMMA was to take "8.5% of net collections of hospital charges and 7.5% of office charges")

$1,369.02: medicare claims that CMMA was unable to collect

$2,903.31: claims that CMMA could not process because one physician was not credentialed

$200.00: software to access hospital information

In addition, the court awarded CMMA attorney's fees, under Section 10 of the Agreement, in the amount of $119,909.80, and costs in the amount of $4,442.53. On May 13, 2008, appellants filed this appeal.[3]

---

**3.** In their brief, appellants contend that "[n]o judgment has been entered on the Counterclaim," but do not point to any specific violation of Maryland Rule 2–601. Here, the complaint and counterclaim constituted one claim because they involved the same facts. *Carl Messenger Serv., Inc. v. Jones,* 72 Md.App. 1, 4–5, 527 A.2d 763 (1987) (citing *East v. Gilchrist,* 293 Md. 453, 461, 445 A.2d 343 (1982)). And, our review of the record shows that the judgment in this case qualifies as a final, appealable judgment because: 1) it was docketed on April 14, 2008 as a "final disposition;" 2) in its oral ruling, the court addressed CMMA's breach of contract claim as well as all three counts listed in appellants' counterclaim; and 3) a "notice of judgment" bearing the circuit court

## Discussion

When an action has been tried without a jury, we "review the trial court's decision on both the law and the evidence, upholding factual findings unless clearly erroneous, but subjecting its legal conclusions to *de novo* review." *Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 183 Md. App. 710, 722, 963 A.2d 253 (2009) (citing *Jackson v. 2109 Brandywine, LLC*, 180 Md.App. 535, 567, 952 A.2d 304 (2008)); *see also* Md. Rule 8–131(c). " '[U]nder the clearly erroneous standard, this Court does not sit as a second trial court, reviewing all the facts to determine whether an appellant has proven his case.' " *Goss v. C.A.N. Wildlife Trust, Inc.*, 157 Md.App. 447, 456, 852 A.2d 996 (2004) (quoting *Lemley v. Lemley*, 109 Md.App. 620, 628, 675 A.2d 596 (1996)). Rather, "[o]ur task is limited to deciding whether the circuit court's factual findings were supported by 'substantial evidence' in the record." *Liberty Mut. Ins. Co. v. Md. Auto. Ins. Fund*, 154 Md.App. 604, 609, 841 A.2d 46 (2004) (citing *GMC v. Schmitz*, 362 Md. 229, 234, 764 A.2d 838 (2001)). " 'If there is any competent and material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous.' " *L.W. Wolfe Enters. v. Md. Nat'l Golf, L.P.*, 165 Md.App. 339, 343, 885 A.2d 826 (2005) (quoting *YIVO Inst. for Jewish Research v. Zaleski*, 386 Md. 654, 663, 874 A.2d 411 (2005)).

"Although the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not." *Goss, supra*, 157 Md.App. at 456, 852 A.2d 996. "Instead, 'where the order involves an interpre-

---

case number for both the complaint and counterclaim was recorded by the clerk of the circuit court on April 18, 2008. *See Addison v. State*, 173 Md.App. 138, 152–53, 917 A.2d 1200 (2007) ("If a ruling of the court is to constitute a final judgment . . .:(1) it must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court properly acts pursuant to Md. Rule 2–602(b), it must adjudicate or complete the adjudication of all claims against all parties, and (3) the clerk must make a proper record of it in accordance with Md. Rule 2–601.") (Quoting *Bd. of Liquor v. Fells Point Café*, 344 Md. 120, 129, 685 A.2d 772 (1996)).

tation and application of Maryland statutory and case law, we must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review.' " *Jackson, supra,* 180 Md.App. at 567, 952 A.2d 304 (quoting *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609 (2002)). "The interpretation of a contract is a legal question subject to *de novo* review." *Regency Furniture, supra,* 183 Md.App. at 722, 963 A.2d 253 (citations omitted). "Maryland follows the objective theory of contract interpretation," which "focuses on the written text: the construing court's task is to determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.* (citations and internal quotation marks omitted).

## I. Appellants were parties to the Agreement.

Appellants contend that "Dr. Thomas signed the [Agreement] only as a representative of Laurel Radiology" and that "[t]he LLC did not sign the [Agreement] at all." Therefore, appellants assert that CMMA "had no cause of action for breach of contract ... because no contract was formed" between CMMA and appellants. As such, appellants argue that the trial court erred when it precluded them from moving to dismiss for failure to state a claim, based on the fact that they did not raise the privity issue until trial. As we will explain, appellants' argument is flawed.

### A. *Appellants failed to specifically plead a negative defense pursuant to Maryland Rule 2–323(f).*

When CMMA filed its complaint in circuit court, it averred:

7. On or about March 13, 2005, CMMA entered into a Billing Services Agreement (the "Contract") with Dr. Thomas and/or Capitol Radiology [the LLC], pursuant to which CMMA agreed to provide billing services, ... in connection with medical services provided by Dr. Thomas.

8. Pursuant to the Contract, Dr. Thomas and/or Capitol Radiology agreed to, among other things, compensate CMMA for billing services....

In their answer to the complaint, appellants stated:

7. Defendants admit that on or about March 13, 2005 a contract was entered into, the terms of which speak for themselves. All other allegations contained in this Paragraph of the Complaint are hereby denied.

8. Defendants aver that the terms of the contract speak for themselves, and deny any allegations in this Paragraph which seek to vary or mischaracterize the terms of the contract.

Appellants argue that "the trial court abused its discretion by failing to require further proof of the actual contracting parties," as CMMA had the burden of proving the allegations made in its complaint. But, with regard to the issue of whether a written contract was executed between CMMA and appellants, appellants failed to specifically raise a "negative averment" pursuant to Maryland Rule 2–323(f). Instead, appellants admitted that an Agreement was entered into on March 13, 2005, and proceeded to answer by saying that "the terms of the contract speak for themselves" and that "[a]ll other allegations contained in this Paragraph of the Complaint are hereby denied." [4]

■ According to Rule 2–323(f):

---

**4.** By merely stating that "the terms of the contract speak for themselves," appellants' answer may be problematic in attempting to specify which allegations were, in fact, being denied. According to Maryland Rule 2–323(c), "[d]enials shall fairly meet the substance of the averments denied." This section of the Rule is derived from the 1966 version of the Federal Rules of Civil Procedure 8(b) and former Rule 372(a)(2). Previously, federal courts have held "responses that the documents 'speak for themselves' to be admissions that the documents read as [the complainant] represents." *N.H. Ins. Co. v. Marinemax of Ohio, Inc.*, 408 F.Supp.2d 526, 530 (N.D.Ohio 2006). As the United States District Court for the Northern District of Illinois, Eastern Division, once noted:

This Court has been attempting to listen to such written materials for years (in the forlorn hope that one will indeed give voice)—but until

when a party desires to raise an issue as to (1) the legal existence of a party, including a partnership or a corporation, (2) the capacity of a party to sue or be sued, (3) the authority of a party to sue or be sued in a representative capacity, (4) the averment of the execution of a written instrument, or (5) the averment of the ownership of a motor vehicle, the party shall do so by negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge. If not raised by negative averment, these matters are admitted for the purpose of the pending action....

Based on the arguments that appellants now raise before this Court, we believe that appellants could have raised negative averments under subsections (1), (3), and (4) of Rule 2–323(f). For example, if it was appellants' contention that the party with whom CMMA contracted—Capitol Radiology, DBA Laurel Radiology—was not a legal entity capable of being sued, then it should have stated as such. *See* Md. Rule 2–323(f)(1). Appellants could also have raised the negative averment that Dr. Thomas did not have the authority to be sued in a representative capacity, *see* Md. Rule 2–323(f)(3), or that the execution of a written instrument between CMMA and appellants never took place, *see* Md. Rule 2–323(f)(4). Because appellants did not plead any negative defenses, we hold that the circuit court properly admitted CMMA's averments, for

some such writing does break its silence, this Court will continue to require pleaders to employ one of the three alternatives that are permitted....

*State Farm Mut. Auto. Ins. Co. v. Riley*, 199 F.R.D. 276, 279 (N.D.Ill. 2001). *See also Banks v. McCosker*, 82 Md. 518, 525, 34 A. 539 (1896) ("We think it very clear that the legal effect and meaning of the statute is that the *next succeeding pleading* must *in terms* deny the signatures of the maker, and of the payee as well....") (First emphasis in original; second emphasis added); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1264 (3d ed. 2004) ("It is also insufficient to ... claim that 'the documents speak for themselves.' ").

As the appellants included a general denial in their answer, the statement "the terms of the contract speak for themselves" was superfluous and of no effect. It may, however, be an appropriate response to an allegation that paraphrases or summarizes one isolated provision of a contract.

the purpose of the pending action. Although the court did not cite Rule 2–323(f) in finding that appellants "waived their ability to challenge being sued," we affirm its decision.

Appellants rely on *Fifer v. Clearfield & Cambria Coal & Coke Co.*, 103 Md. 1, 62 A. 1122 (1906) to support their argument, but their reliance on that case is misplaced. In *Fifer*, the plaintiff buyer brought suit against the defendant company "to recover damages for the alleged failure and neglect of the [company] to ship and deliver to the [buyer] certain coal, alleged to have been sold by the [company] to the [buyer]" through the company's agent. *Id.* at 2, 62 A. 1122. In his pleading, the buyer alleged that he "entered into a written contract with the said [company], by Rogers, Holloway & Co., agents of the [company] duly authorized by them to execute said contract in its behalf." *Id.* In its answer, the company stated "that it was never indebted and never promised as alleged; and for a third plea, that the alleged contract was procured by the fraud of the [buyer]." *Id.* At trial, the buyer "contended that the contract having been set forth *verbatim* in the declaration, and not having been denied by the [company] in its next succeeding pleading, it must be taken as admitted for the purposes of this action as well as the agency of Rogers, Holloway & Co." *Id.* Disagreeing with the buyer's argument, the Court of Appeals affirmed the decision of the circuit court, holding:

> The failure of the [company] to make denial of the execution of the contract as set out in the declaration, had the effect only of relieving the [buyer] of proving it, but it did not admit that Rogers, Holloway & Co. were the agents of the [company] with authority to bind them as charged in the *narr*. That was put in issue by the pleas, and was open for proof as any other fact that had been alleged.

*Id.* at 3, 62 A. 1122.

The present case differs from *Fifer*, however, because CMMA's pleading did not allege that Laurel Radiology was an agent of Dr. Thomas and/or the LLC. Rather, CMMA averred that it entered into the Agreement with Dr. Thomas and the

LLC, directly, as separate entities. The pleading in this case did not place agency at issue and, therefore, the issue of agency was not part of this case and, therefore, not open for proof at trial.

### B. Any error in the court's reasoning, in finding that appellants failed to timely raise the issue, was harmless.

 Appellants also argue that the circuit court erred when it reasoned that appellants' failure "to timely raise the issue" barred them from moving to dismiss the case, at trial. Although we agree that this was error on the court's part, *see* Md. Rule 2–324(a),[5] we hold that such error was harmless because appellants were, indeed, parties to the Agreement. *Flores v. Bell*, 398 Md. 27, 33, 919 A.2d 716 (2007) ("It has long been the policy in this State that this Court will not reverse a lower court judgment if the error is harmless.") (Citations omitted).

 In this case, Dr. Thomas signed the Agreement on behalf of "Capitol Radiology, DBA Laurel Radiology." Thus, it can be argued that there was no "express contract" between CMMA and appellants, as neither Dr. Thomas nor the LLC were named in the Agreement. *See County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600 (2000) ("An express contract has been defined as 'an actual agreement of the parties'") (quoting BLACK'S LAW DICTIONARY 323 (6th ed.1990)). For a year after the Agreement was signed, however, appellants performed Laurel Radiology's duties under the Agreement, while CMMA performed those attributed to it. Appellants, therefore, accepted CMMA's contract through their actions. *See Porter v. Gen. Boiler Casing Co.*, 284 Md. 402, 409–10, 396 A.2d 1090 (1979) ("Acceptance can be accomplished by acts as well as words") (citation omitted).

---

5. Pursuant to this Rule, "[a] defense of failure to state a claim upon which relief can be granted ... may be made ... at the trial on the merits."

Here, an implied in fact contract existed between the parties, although CMMA was not given the chance to prove that it expressly contracted with appellants. *See Burt v. Myer*, 71 Md. 467, 504, 18 A. 796 (1889) ("It is true that where there is a failure to prove a special contract, the law will imply a contract by the parties to do what *ex [a]equo et bono* [ [6] ] they ought to do"). Such a contract " 'is proved by circumstantial evidence.' " *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md.App. 766, 774, 471 A.2d 1121 (1984) (quoting Dobbs, *Handbook on the Law of Remedies* § 4.2 (1973)). Hence, an implied contract existed between CMMA and appellants, as CMMA performed billing services on behalf of appellants and posted all payments on appellants' account. *See Downs v. Mayor of Baltimore*, 111 Md. 674, 694, 76 A. 861 (1910) (" 'There is an implied contract to make compensation for money which it has no right to retain.' ") (Quoting *Centr. Transp. Co. v. Pullman's Palace Car Co.*, 139 U.S. 24, 11 S.Ct. 478, 35 L.Ed. 55 (1891)); *see also J. Roland Dashiell & Sons, supra*, 358 Md. at 94, 747 A.2d 600 (2000) ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.") (Citations and internal quotation marks omitted); *Granite Constr. Co.*, 57 Md.App. at 774, 471 A.2d 1121 (The term "implied in fact contract" means that " 'the parties had a contract that can be seen in their conduct rather than in an explicit set of words.' ") (Quoting Dobbs, *supra*, § 4.2)).

## II. Under the terms of the Agreement, appellants had a duty to provide demographics and to perform credentialing.

Having determined that appellants were parties to the Agreement, we proceed to discuss the remaining issues with

---

**6.** "According to what is equitable and good." BLACK'S LAW DICTIONARY 600–01 (8th ed.1999).

the understanding that "Capitol Radiology, DBA Laurel Radiology" and appellants are one and the same.

## A. Demographics

It is undisputed that, in order to prepare bills and collect payment for services rendered, certain patient identification and insurance information, called "demographics," had to be gathered from patients and manually entered into CMMA's computerized billing system. Appellants collected the demographics from patients, then sent CMMA the information on paper. Following trial, the court found, among other things, that there were "deficiencies in the [appellants'] transmittal of demographics" and, therefore, CMMA proved its claim for breach of contract. On appeal, appellants argue that "the trial court 'misconstrued' the Agreement" in ruling that appellants "had the responsibility . . . [of] physically inputting the data into [CMMA]'s computer."

According to the Agreement, appellants were to "provide" CMMA with "all of the demographic and charge information necessary to prepare the billing statements and insurance forms," while CMMA was "responsible for the timely preparation of billing statements and insurance forms." Appellants argue that, because neither the term "provide" nor the word "prepare" was defined in the Agreement, then the ordinary meanings of the words control. Citing Webster's New Twentieth Century Dictionary of the American Language, Unabridged 1450 (2d ed.1983), appellants contend that to "provide" means "to furnish; to make available; to supply; to afford." Moreover, appellants assert that the ordinary meaning of the word "prepare" is "to make ready, usually for a specific purpose; to make suitable; to fit; to adapt. . . ." Thus, appellants reason that CMMA's responsibility "was to take the information supplied . . . and do whatever was necessary . . . in order to put together bills," including "keying the information from the paper into [CMMA]'s computer."

Again, appellants' argument is flawed. By relying on *Stratakos v. Parcells*, 172 Md.App. 464, 471, 915 A.2d 1022

(2007), appellants assume that the terms at issue in this case are "plain and unambiguous." To the contrary, because the word "provide" could mean "to supply" by giving the demographic information on a piece of paper or "to supply" by entering the information into CMMA's computer, then the terms of the contract are ambiguous. *See United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 80 (2006) ("A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning.") (Citation and internal quotation marks omitted). " 'If a trial court finds that a contract is ambiguous, it may receive parol evidence to clarify the meaning.' " *Anderson Adventures, LLC v. Sam & Murphy, Inc.,* 176 Md.App. 164, 179, 932 A.2d 1186 (2007) (quoting *Maslow v. Vanguri,* 168 Md.App. 298, 319, 896 A.2d 408 (2006)).

At trial, the court admitted into evidence an e-mail dated February 4, 2005, from Maureen McCarthy of Snyder Cohn, notifying Jeanne Kohn, the General Manager of CMMA, that Dr. Thomas thought "it would be best if [Dr. Thomas] had a full time billing person in the office to gather data from the office [patients] and the hospital and then she could certainly ***enter that into the system*** " (Emphasis added). On February 28, 2005, Ms. McCarthy sent another e-mail to Ms. Kohn, notifying her that Dr. Thomas "hired a biller who ... is terrific." Then, on March 11, 2005, Ms. McCarthy negotiated the terms of the Agreement as to CMMA's fees, stating that "the rates are too high considering that we will have a full time biller to coordinate the function."

Further, the court noted:

Cynthia Atkins was hired by Capitol Radiology as a billing coordinator. She had 16 years of billing experience, and more important, four years of radiology billing experience. This would tend to deflate any argument or any insinuation that Dr. Thomas and her staff had no idea what the amount of work would be involved in the billing services.

Her testimony revealed some very incriminating information. One, Capitol Radiology did not have the computer system necessary to enter demographic information that

they had indicated they would be getting, and consequently, was not keying in the demographics; and two, although she was hired as a billing coordinator, she was quickly moved to office manager, and no one took over as a billing coordinator at Capitol Radiology.

In August of 2005, Capitol Radiology hired additional workers, surge workers, on a part-time basis to help with their backlog of demographic information. . . .

. . . This action demonstrated that Capitol Radiology was not fulfilling the terms of the contract, and affirmed their understanding of their obligation to supply CMMA with the demographic information.

Based on this evidence, we hold that the circuit court was not clearly erroneous in its findings that there were "deficiencies in the [appellants'] transmittal of demographics."

### B. Credentialing

Appellants also argue that the trial court erred in finding that "both parties expected and understood that [appellants] would perform the credentialing." Appellants assert that, because the Agreement "made no mention of 'credentialing', and so did not address who was responsible for performing the task," the court erred in finding that it was their obligation to fulfill. Further, appellants contend that "the proper ruling would have been that no contract was formed because the parties did not agree on an essential term."

Appellants do not dispute that, in order for insurance claims to be accepted and paid by a health insurer, the facility or doctor providing the medical services has to be credentialed with the private or government insurance carrier. Therefore, it is reasonable to assume that one of the parties to the Agreement was made responsible for performing the task. Because the Agreement did not specify which party would perform the credentialing, the terms are, again, ambiguous. *See Anderson Adventures, supra,* 176 Md.App. at 178, 932 A.2d 1186 (To determine whether a contract is ambiguous, "the court considers the character of the contract, its purpose,

and the facts and circumstances of the parties at the time of the execution.") (Citation and internal quotation marks omitted). Thus, we look to parol evidence once more to clarify the parties' intentions.

While announcing its ruling following the trial, the court discussed several pieces of evidence upon which it based its decision:

> And in that, I highlight Ms. [Kohn]'s e-mail to Maureen McCarthy. "Also, I was hoping that you could give me any credentialing information that you have. We have ordered this division and can probably begin to set it up tomorrow or Monday. Do you have the following info?"

> \* \* \*

> Maureen McCarthy testified that Snyder Cohn started the credentialing process on behalf of Capitol Radiology. Her e-mail to Dr. Thomas on January 10, 2005, confirms this. Not just one e-mail.

 The court then proceeded to read from nine documents, all of which were admitted into evidence, discussing appellants' need to perform credentialing. One e-mail reflected that Ms. McCarthy reminded Dr. Thomas of the "need to ... get credentialing started;" another asked one of Dr. Thomas's staff members "how ... the credentialing process [was] going." The court also noted that several of Snyder Cohn's bills invoicing the work done on behalf of appellants dealt with the issue of credentialing. In addition, Larry McKenney, the Chief of Operations for Capitol Radiology, confirmed that appellants hired a woman named Sharifah Riley–Mack to do the credentialing.

Based on this evidence, we hold that the circuit court was not clearly erroneous in finding that, under the Agreement, appellants were expected to perform the credentialing.

## III. The trial court did not err in awarding damages totaling $55,396.83.

Appellants next contest the amount of damages awarded to CMMA. Appellants do not challenge the court's award of

$45,234.17—monies past due for the months of April, May, and June 2006. Rather, they assert that "[t]he trial court's award of damages for the alleged demographics/credentialing breach were completely speculative and erroneous." As we explained in the preceding section, however, appellants were responsible for providing demographics and performing credentialing. Therefore, they were obligated to compensate CMMA for its losses, suffered as a result of appellants' breach. *See Milske v. Steiner Mantel Co.*, 103 Md. 235, 249, 63 A. 471 (1906) ("Thus, if the act to be done by the party binding himself can only be done upon a corresponding act being done or allowed by the other party, an obligation by the latter to do or allow to be done the act or things necessary for the completion of the contract will be necessarily implied.") (Citing *Churchward v. The Queen*, 6 B. & S. 807); *accord Funger v. Somerset*, 249 Md. 311, 331, 239 A.2d 748 (1968).

 "In a breach of contract action, upon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty." *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md.App. 562, 594, 936 A.2d 915 (2007) (citations omitted). At issue here is the third factor. In order to recover damages for lost profits, the plaintiff must be able to prove lost profits with "reasonable certainty." *Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38 Md.App. 119, 138–39, 380 A.2d 627 (1977). " '[R]easonable certainty' of contract damages means the likelihood of the damages being incurred as a consequence of the breach, and their probable amount." *Hoang, supra*, 177 Md.App. at 595, 936 A.2d 915. In this case, the damages at issue fall into the category of "direct profits." Those are profits " 'that would have resulted immediately from the performance of the contract broken.' " *Id.* (quoting *M & R Contractors & Builders v. Michael*, 215 Md. 340, 347, 138 A.2d 350 (1958)).

 In their brief, appellants rely on two out-of-state cases and argue that CMMA "failed to show that its methodol-

ogy for calculating its damages—using four months' history of collections or applying a blended rate—was based on generally accepted accounting principles." In Maryland, however, "if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference." *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.,* 311 Md. 36, 41, 532 A.2d 694 (1987) (quoting *Michael, supra,* 215 Md. at 349, 138 A.2d 350). "[M]ere difficulty in ascertaining the amount of damage is not fatal," and "mathematical precision in fixing the exact amount is not required." *Id.* But, "[t]he evidence must ... lay some foundation enabling the fact finder to make a fair and reasonable estimate of the amount of the damage." *Della Ratta, supra,* 38 Md.App. at 143, 380 A.2d 627. In this regard, damages can be ascertained "by reference to some fairly definite standard, such as market value, established experience, or direct inference from known circumstances." *Id.* (quoting 22 Am.Jur.2d *Damages* § 25).

At trial, CMMA presented evidence of damages based on the amount that appellants actually collected or would have been able to collect, and for which CMMA was not compensated. Ms. Kohn, who testified that she has been a manager at medical billing companies since 1990, explained that she calculated CMMA's damages as follows:

> I would think the fair way to do it would be take an average, a gross collection rate and then once that number was arrived at to then do a percentage. Since I wouldn't know whether they were hospital or office, I would do it at a blended percentage of 8 percent.

> \* \* \*

> I [calculated an average collection rate] by using some of the more stable looking months that we did billing. . . . So I took a few of the more normal looking months and average[d] them and came up [with] I believe the number was 28.5 percent.

Hence, the way in which she calculated the damages in this case satisfied the factors that we set forth in *Medi–Cen Corp. v. Birschbach,* 123 Md.App. 765, 785, 720 A.2d 966 (1998):

... [C]ourts should consider the collectibility of accounts receivable, and from that, determine the value of the accounts receivable. Ultimately, the value of accounts receivable are based on the collectibility of the particular accounts at issue.... Inquiry into the obligor's resources may also be useful, as well as testimony from witnesses experienced in similar businesses or acquainted with the debtor's transactions. Experts may be useful in considering the collectibility of the holder's past accounts receivable and, based on those values and records, calculating the value of the holder's uncollected accounts receivable.

In mentioning these factors, we are not providing an exhaustive list. Any competent and admissible evidence tending to shed light on the collectibility of accounts receivable might be relevant and material. We hasten to add that we should not be understood to say or imply that accounts receivable are never capable of being found to be 100% collectible, provided the evidence supports such a conclusion.

Although Ms. Kohn was not presented as an expert, she had ample experience in medical billing and was well-acquainted with appellants' transactions. After considering the values and records of appellants' prior collections, she was able to calculate a fair and reasonable estimate of CMMA's damages. Therefore, we hold that the circuit court did not err in awarding damages totaling $55,396.83.

## IV. The trial court erred in awarding appellee attorney's fees because the Agreement provided for payment of attorney's fees only as part of indemnification against a third-party suit.

Lastly, appellants argue that the circuit court erred in awarding CMMA attorney's fees "for prosecuting a first-party breach of contract claim and for defending against a counterclaim where the contract provided for payment of attorney's fees only as part of indemnification against a third-party suit." We agree. CMMA's argument—that "the Agreement expressly provides for attorney's fees" because "the broad lan-

guage of the indemnification provision clearly indicates that it applies to *all* claims, demands, costs, expenses, liabilities and losses ... suffered ... by CMMA due to [appellants'] performance"—is not supported by the law and the evidence and, therefore, fails. (Emphasis in original).

 With regard to the grant of attorney's fees, "Maryland follows the common law 'American Rule,' which states that, generally, a prevailing party is not awarded attorney's fees 'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.'" *Nova Research, Inc. v. Penske Truck Leasing Co., L.P.*, 405 Md. 435, 446, 952 A.2d 275 (2008) (quoting *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434 (2005)). In this case, the second, third, and fourth exceptions are not at issue: there is no relevant statute authorizing the recovery of attorney's fees in breach of contract actions; there is no third party involved; and CMMA did not incur counsel fees in defense of the criminal or civil charge in a malicious prosecution action.[7] *See, e.g., Bahena v. Foster*, 164 Md.App. 275, 289–90, 883 A.2d 218 (2005). Therefore, we will address only the first exception to the American Rule, before proceeding to discuss the trial court's denial of CMMA's motion for attorney's fees pursuant to Maryland Rule 1–341.

### A. The court erred in granting attorney's fees per the Agreement.

When the circuit court announced its ruling at the conclusion of trial, it opined:

Attorney's fees. Section 10 entitled "Indemnification of the Billing Services Agreement" is inartful and awkward.

---

7. "[A]ctions for malicious prosecution and malicious use of process are concerned with maliciously causing criminal or civil process to issue for its ostensible purpose, but without probable cause." *Walker v. Am. Sec. & Trust Co.*, 237 Md. 80, 87, 205 A.2d 302 (1964) (citations omitted).

However, I find that it, as I said before in trial, I find that it does allow CMMA to obtain reasonable attorney's fees for their litigation expenses, both in pursuit of their complaint for breach of contract and a defense of Capitol Radiology's counterclaim.

Section 10 was the only portion of the Agreement that mentioned recovery for attorney's fees and costs expended. Section 9 of the Agreement, entitled "Termination and Breach," set forth certain responsibilities and obligations between the parties resulting from termination or breach of the Agreement, but did not discuss an award of attorney's fees and costs in the event that one party pursues a claim for breach or termination of the contract when one party believes the other party is at fault.

In Maryland, "[a]n express indemnity agreement, being a written contract, must be construed in accordance with the traditional rules of contract interpretation." *Ulico Cas. Co. v. Atl. Contracting & Material Co., Inc.*, 150 Md.App. 676, 692, 822 A.2d 1257 (2003), *aff'd*, 380 Md. 285, 844 A.2d 460 (2004). "[C]ontractual attorney's fees provisions must be strictly construed to avoid inferring duties that the parties did not intend to create...." *Nova Research, supra*, 405 Md. at 455, 952 A.2d 275 (quoting Robert L. Rossi, *Attorneys' Fees* § 9:18 (3d ed.2002, Cum.Supp.2007)). Thus, "a trial court may award attorneys' fees only ... where ... a contract between the parties *specifically* authorizes attorneys' fees." *Maxima Corp. v. 6933 Arlington Dev. Ltd. P'ship*, 100 Md.App. 441, 452, 641 A.2d 977 (1994) (citations omitted and emphasis added).

Generally, "promises by one party to indemnify the other for attorney's fees run against the grain of the accepted policy that parties are responsible for their own fees." *Nova Research, supra*, 405 Md. at 455, 952 A.2d 275 (quoting Robert L. Rossi, *Attorneys' Fees* § 9:18 (3d ed.2002, Cum.Supp.2007)). In *Nova Research*, the Court of Appeals addressed the issue of "whether the contract provision for indemnification includes first party attorney's fees, where the contract language does

not provide expressly for the recovery of attorney's fees." *Id.* at 439, 952 A.2d 275. The Court stated:

> The indemnification provision, which encompasses loss "caused or arising out of" the failure to comply with the agreement, is distinctly different from the loss provision in *Atlantic [Contracting & Material Co., Inc. v. Ulico Cas. Co.,* 380 Md. 285, 844 A.2d 460 (2004)]. The agreement in *Atlantic* stated explicitly that it covered loss "sustained or incurred . . . in connection with or as a result of . . . the enforcement of this Agreement." *Atlantic,* 380 Md. at 302, 844 A.2d at 469. The contract in the case *sub judice* does not so provide. Interpreting the indemnification provision in the context of the contract as a whole, we do not find support that the parties intended the indemnification to cover first party attorney's fees. In examining the scope of the indemnification provision, we find no express fee shifting provision. Under *Jones v. Calvin B. Taylor Banking Co.,* 253 Md. 430, 441–42, 253 A.2d 742, 748 (1969), we implied a fee-shifting provision to allow an indemnitee to recover reasonable attorney's fees incurred in defending against a third party. Where the contract provides no express provision for recovering attorney's fees in a first party action establishing the right to indemnity, however, we decline to extend this exception to the American rule, which generally does not allow for prevailing parties to recover attorney's fees.

*Id.* at 451, 952 A.2d 275. The *Nova Research* Court concluded its analysis by holding:

> . . . [W]e adopt the approach followed by the majority of states, and require that the contract provide expressly for recovery in first party enforcement actions. The contract in the case before us does not explicitly cover expenses in the enforcement of the contract; therefore, we shall not imply the recovery of attorney's fees accrued in a first party action establishing the right to indemnity.

*Id.* at 458, 952 A.2d 275.

A straightforward reading of the terms of the Agreement confirms that the parties did not intend to provide for a

recovery of attorney's fees in the event of default. Section 9 of the Agreement addressed the issues of "Termination and Breach," yet it did not include a provision for the recovery of attorney's fees if either termination or default occurred. Moreover, Section 10 of the Agreement addressed "Indemnification," but did not provide for attorney's fees and costs for enforcement in a *first* party breach of contract action. Instead, Section 10 provided that appellants "shall indemnify and hold CMMA harmless from and against all claims, demands, costs, expenses, liabilities and losses (including reasonable attorneys' fees) which may result against CMMA as a consequence of: (i) Capitol Radiology, DBA Laurel Radiology, *performance* of this Agreement, except to the extent caused by the acts or omissions of CMMA." (Emphasis added).

We agree with the circuit court that the wording of Section 10 is "awkward." Because the words "Capitol Radiology, DBA Laurel Radiology, performance of this Agreement" are arranged together under subsection (i), however, we understand this section to mean that appellants would be held responsible for attorney's fees if such fees result "as a consequence of ... Capitol Radiology, DBA Laurel Radiology['s] performance of this Agreement." Therefore, appellants would pay CMMA's attorney's fees in the event that CMMA is sued as a result of appellants' *performance* of the Agreement.

For example, if appellants collected demographic information and provided it to CMMA pursuant to the Agreement, and one of appellants' patients sued CMMA as a result of having such information, then CMMA could ask appellants to pay for attorney's fees incurred in defending against such lawsuit. CMMA could also require appellants to pay attorney's fees if CMMA is sued for violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.*, for repeatedly making annoying telephone calls or initiating similar forms of contact. But, because the Agreement did not specify that appellants would be held responsible for attorney's fees if such fees result as a consequence of Capitol Radiology, DBA Laurel Radiology's *default or termination* under the Agreement, then the indemnification provision of Section 10 cannot

be interpreted to imply the recovery of attorney's fees accrued in this type of first party breach of contract action.

CMMA argues that appellants' reliance on *Nova Research* is "misplaced" because, unlike here, "the indemnification provision in *Nova Research* did not expressly provide for attorney's fees." As we previously stated, however, *Nova Research* "require[s] that the contract provide *expressly for recovery in first party enforcement actions." Nova Research, supra,* 405 Md. at 458, 952 A.2d 275 (emphasis added). *Nova Research* is not limited to situations where an indemnification provision does not expressly include "attorney's fees." Instead, the *Nova Research* Court found that the dispositive question was whether the action was a first party action to enforce the contract. *See id.* at 449–52, 952 A.2d 275. It would be illogical to construe the Agreement in a way that allows us to disregard Section 9 and insert additional words into Section 10.

This case is similar to *Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186 (2d Cir.N.Y.2003), *cited with approval* in *Nova Research, supra,* 405 Md. at 454–55, 952 A.2d 275. In *Oscar Gruss & Son,* "the United States Court of Appeals for the Second Circuit had to determine whether an indemnification provision applied only to claims brought by third parties or whether it applied also to claims brought between the parties to the agreement." *Nova Research, supra,* 405 Md. at 454, 952 A.2d 275.

> The indemnification provision provided for reimbursement of any legal expenses incurred "in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings arising in any manner out of or in connection with the rendering of services by the Advisor hereunder *(including, without limitation, in connection with the enforcement of this Agreement* and the indemnification obligations set forth herein)."

*Id.* at 454–55, 952 A.2d 275 (quoting *Oscar Gruss & Son, supra,* 337 F.3d at 199) (emphasis in original). "[C]onstruing the language in context with the surrounding contractual provisions," the Second Circuit determined that "the right to attorney's fees applied only to claims brought by third parties, and not to an action commenced by the indemnitee against the indemnitor." *Id.* at 455 (citing *Oscar Gruss & Son, supra,* 337 F.3d at 200); *see also Phoenix Servs. L.P. v. Johns Hopkins Hosp.,* 167 Md.App. 327, 393, 892 A.2d 1185 (2006) (a disputed term in a contract "must be considered in context") (citation omitted).

Likewise, as the Second Circuit did in *Oscar Gruss & Son,* we construe the language of Section 10 such that CMMA's right to attorney's fees applies only to claims brought against CMMA as a result of appellants' performance of the contract. Therefore, we hold that, under the Agreement, the right to attorney's fees and costs applies only to claims brought by third parties.

**B. The court did not err in denying CMMA's motion for attorney's fees pursuant to Maryland Rule 1–341.[8]**

Maryland Rule 1–341 states:

In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it.

CMMA argues that "Maryland Rule 1–341 also provides a basis for the award of attorney's fees" because "[a]ppellants' actions in this case clearly demonstrate a lack of substantial justification and good faith." CMMA, however, does not point

---

**8.** Although CMMA did not file a cross-appeal with regard to this issue, we choose to address it, albeit as dicta, for the guidance of the parties and the trial court.

to anything in the record, nor does it provide any legal support, for this assertion.

In *Garcia v. Foulger Pratt Dev., Inc.*, 155 Md.App. 634, 845 A.2d 16 (2003), we noted that " '[a]n award of counsel fees [pursuant] to Rule 1–341 is an 'extraordinary remedy,' which should be exercised only in rare and exceptional cases.' " *Id.* at 678, 845 A.2d 16 (quoting *Barnes v. Rosenthal Toyota, Inc.*, 126 Md.App. 97, 105, 727 A.2d 431 (1999)) (additional citation omitted). "Rule 1–341 represents a limited exception to the general rule that attorney's fees are not recoverable by one party from an opposing party. . . ." *Legal Aid Bureau, Inc. v. Bishop's Garth Assocs. Ltd. P'ship*, 75 Md.App. 214, 223, 540 A.2d 1175 (1988) (citation omitted). "Before a court metes Rule 1–341 sanctions, it must make an evidentiary finding of 'bad faith' or 'lack of substantial justification.' " *Id.* at 220, 540 A.2d 1175 (citing *Hess v. Chalmers*, 33 Md.App. 541, 545, 365 A.2d 294 (1976)). "Whether bad faith or lack of substantial justification is found by a court to exist in any given case is a question of fact subject to a 'clearly erroneous' standard of review." *Id.* at 220–21, 540 A.2d 1175 (citing *Century I Condo. Ass'n, Inc. v. Plaza Condo. Joint Venture*, 64 Md.App. 107, 117, 494 A.2d 713 (1985)).

In this case, there is nothing in the record to support CMMA's contention that appellants' actions "demonstrate a lack of substantial justification and good faith." CMMA initially filed suit against appellants, and appellants filed an answer and counterclaim in its own defense. *See U.S. Health, Inc. v. State*, 87 Md.App. 116, 128, 589 A.2d 485 (1991) ("[W]e are mindful that Rule 1–341 was not intended to punish legitimate advocacy, or to force abandonment of questionable or innovative causes, or to penalize exploration beyond existing legal horizons.") (Internal citations and quotation marks omitted). Although the trial court found in favor of CMMA, there is no indication that appellants made frivolous claims or defenses. *See Blitz v. Beth Isaac Adas Isr. Congregation*, 115 Md.App. 460, 487–88, 694 A.2d 107 (1997), *rev'd on other grounds*, 352 Md. 31, 720 A.2d 912 (1998). Instead, appellants'

entire course of conduct was justified and not undertaken in bad faith. *Cf. U.S. Health, supra,* 87 Md.App. at 128, 589 A.2d 485 (Appellant's conduct in "filing a spate of pre-hearing motions, an appeal to the appeal board from the hearing officer's denial of certain of those motions, an appeal to the circuit court from the appeal board's ruling, and an appeal to this Court from the judgment of the circuit court was undertaken in bad faith, for the purpose of delaying, prolonging, and obstructing the proceedings," and was "utterly unjustified, amount[ing] to an abuse of the judicial process.").

For the foregoing reasons, we reverse the judgment of the circuit court as to the issue of attorney's fees and remand the case for proceedings not inconsistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IS AFFIRMED IN PART AND REVERSED IN PART. CASE IS REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS ASSESSED AS FOLLOWS: 3/4 TO BE PAID BY APPELLANTS; 1/4 TO BE PAID BY APPELLEE.**